No. 25,131.

ANNA STRINGER, *Appellee*, v. C. G. MEESE et al., doing business as THE KANSAS LINE MINING COMPANY, *Appellants*.

SYLLABUS BY THE COURT.

1. COMPENSATION ACT—*Death from Hemorrhage of Lungs—An Accident Arising Out of·and in Course of Workman's Employment.* A workman was employed as a sludge man in the mill of a lead and zinc mine. While making some ordinary repairs about the mill, which was a part of his duty, he suffered a hemorrhage of the lungs, from which he died in a few minutes. Three years prior thereto he had the influenza, which weakened his lungs so that he coughed and spit up phlegm at night. There was medical evidence that in the weakened condition of his lungs the exertion of his work might have caused the hemorrhage. *Held,* sufficient to sustain a finding that his death was the result of an accident arisng out of and in the course of his employment under the workmen's compensation act.

Appeal from Cherokee district court; FRANK W. Boss, judge. Opinion filed November 10, 1923. Affirmed.

*Al. F. Williams, Don H. Elleman,* both of Columbus, and *A. H. Seddon,* of Kansas City, Mo., for the appellants.

*I. N. Kuhn, C. B. Skidmore,* and *Fred Walker,* all of Columbus, for the appellee.

The opinion of the court was delivered by

HARVEY, J.: This is an action brought by Anna Stringer against appellants to recover under the workmen's compensation act for the death of her son, Edward Stringer. The case was tried to the court, who found generally for plaintiff and against defendants, and found, "that on the 25th day of July, 1922, while working in the

course of his employment in defendants' lead and zinc mine in Cherokee county, Kansas, Edward Stringer, a son of the plaintiff herein, received an injury, by accident, arising out of and in the course of his employment, which resulted in his death on the said date . . ." Judgment was for plaintiff, and defendants have appealed.

There is but little dispute about the facts. Edward Stringer was a widower forty-three years of age, who made his home with and supported his mother, a widow seventy-one years old. He had worked at different times about the mills of lead and zinc mines. Two or three years prior to his death he had the flu and it had left him in a weakened condition. He had never been strong since having the flu. He coughed some of a morning before getting out of bed and he would expectorate upon a paper beside the bed. That condition had existed for nearly three years. His sister had observed the sputum. There was no blood in it, but it was white. On the date of his death he was employed as sludge man in the mill of appellants' lead and zinc mine. He had worked there only a few days; prior to that he had not been working steady. Just what took place was told by Walter Covert, who was a helper in the mill and working with him at the time of his death, in substance as follows:

He had been working the mill and the gas went off and they shut down and the mill foreman says: "You and Ed go down in the mill and take out that old flume from that screen and put in this new one." He went down ahead of me and took the tools, you understand under the mill, and Cash and I carried the new flume down there and then Cash went out. When I got there he had the old flume torn out. He said that he would have to do some sawing on it. He got his rule and measured it, and came back and took the square and marked it off, and he was setting on the new flume, and then he picked up the saw and started to sawing, then he gave a kind of a hacking cough. I didn't pay much attention to him at first. The flume he was sawing was made out of bottom and two sides of 1x6 timber, a sort of trough. He started to saw the flume and didn't finish it. I heard him give a cough, and I didn't pay much attention at that time. He picked up the saw again and then I heard him cough again, and when I looked around I saw a spurt of blood, and then he coughed the third time and he took out his teeth and leaned up against the foundation of the mill and stood there a minute and then he turned and went out and up the stairway, and that was the last I saw of him until afterwards. At the time he stood up and leaned against the foundation, I saw him spit up blood. I suppose it was ten minutes after this that I again saw him. He was dead when I got up there. At the time I heard Ed cough he had not been sawing very long. I don't know, possibly a minute, not over that. He had sawed not to exceed one inch. He was using a common handsaw that carpenters use.

It seems reasonably clear that his death resulted from hemorrhage of the lungs. The only question presented to us is, does this evidence support the finding and judgment of the trial court that his death resulted from an injury received by (a) accident, arising (b) out of and, (c) in the course of, his employment? He was working for appellants at the time, hence what occurred arose "in the course of his employment," for that phrase "simply means that it happened while he was at work in his employers' service." (*Cox v. Refining Co.*, 108 Kan. 320, 322, 195 Pac. 863.) It was an undesigned, sudden and unexpected event and, hence, was an accident within the meaning of the workmen's compensation act. (C. J. Treatise on Workmen's Comp. Act, p. 64; *Gilliland v. Cement Co.*, 104 Kan. 771, 180 Pac. 793; *Baggot Co. v. Industrial Com.*, 290 Ill. 530; note on hemorrhage as an accident, 7 A. L. R. 1614.) The question remains, did the injury arise "out of his employment"? This requires that there must be a causal connection between the work which is being performed or the conditions under which it is performed and the resulting injury before the employer shall be liable. In *Cox v. Refining Co.*, 108 Kan. 320, 323, it was said: "But in order to charge the industry with compensation for the workman's injury, such injury must in some sense, in some degree, be due to the workman's employment in the industry." (Citing authorities.) The medical testimony of the case was as follows:

Dr. Dodson was called and found Stringer dead. He saw signs of blood over some of the planks and on the ground and around where he was lying. The blood could have come from a ruptured blood vessel in the lungs or from the stomach. A pulmonary hemorrhage might be caused from a diseased condition of the walls of the blood vessels from different sources and causes. The immediate cause of the rupture might be several things. "Violent exercise would be one, heat would be another. Anything that would create a rapid circulation, you might say. An excessive flow of blood through those blood vessels might cause them to rupture. Q. Would the sawing of the end of a board trough six inches square, made out of 1x6 timber cause an increased circulation of the blood? A. If done rapidly, and continued for any length of time, it would, yes. Q. Suppose a person had had the flu three years before, and from time to time thereafter spit up substances from the lungs and complained of a hurting in the lungs down to the time of the work in question, and he was sawing on a board or trough made of 1x6

timbers or planks, for a minute's length of time, would you say that a person, under those conditions and doing that kind of work, could sustain a hemorrhage of the lung? A. He could. Q. Would that work of sawing there with a handsaw, a person with the condition I have described, would he be likely to suffer from a hemorrhage? A. Under healthy condition, he would not. Under other conditions, he might. Q. Would he, under the conditions I have described? A. It might do it, yes."

He also stated that the ravages of the disease itself causes hemorrhages at various times without any intervening cause; though a person might be sitting down or lying still a hemorrhage is more or less likely to come on at any time with the lungs in the condition described without any intervening cause. He could not say whether the hemorrhage in this instance was caused by the exercise or not. "Q. It could have been? A. Yes, it could have been."

Doctor Janes testified:

"Q. Have you a judgment as to what would bring on the hemorrhage? A. A rupture of the blood vessel, of course. Q. And what would be the cause of that? A. A weakened condition of the wall. Q. Would the exercise in sawing bring on the rupture? A. If in a weakened condition, yes. Q. And where death followed immediately, would it be your judgment that there was a weakened condition beforehand? A. Yes. Q. I will ask you, Doctor, if as a matter of experience and learning, men do die from a hemorrhage brought on by violent exercise? A. Yes, sir. Q. Would the exercise of sawing with a handsaw be sufficient, if there was a weakened condition of the lungs, to bring on a hemorrhage? A. If the lungs were sufficiently weakened, as a matter of fact it would, yes. Q. Where a man was engaged in sawing with a handsaw for about one minute and coughed and spit up blood and a hemorrhage followed, do you have a judgment as to what the cause of that hemorrhage was? A. I would assume the exercise was the immediate cause."

Doctor Brookhart, after a hypothetical question stating the circumstances, testified:

"Q. Have you a judgment, under the statement of facts I have given you, as to what produced or brought about that hemorrhage? A. A rupture of the blood vessel within the lung cavity from the coughing could be caused from the sudden exertion. Q. Would the exercise incident to the sawing with a handsaw on the trough, under the conditions and circumstances I have described, be sufficient to produce the hemorrhage? A. It could have done it, yes. Q. Under the state of circumstances as described to you in my former question, where the deceased party was actually sawing for a minute's time or approximately so, and coughed and spit up blood with the first cough, have you a judgment as to whether the exercise incident to that sawing, or whether the exercise from the coughing, would be the thing that caused the rupture? A. The exercise may have produced the hemorrhage and caused an irritation that

caused the cough. It probably was the irritation of the broken vessel that caused him to cough and spit—any sudden exercise might do that. You sometimes have a hemorrhage from sudden exercise and you have it when you don't exercise, so that it is impossible for anyone to say certain, but we know that the majority of hemorrhages come following exertion. Q. It is the exercise that causes the increased blood flow? A. The blood pressure, yes. Q. An increased blood flow causes pressure? A. As a rule, yes. Q. And under the circumstances described, it is your judgment that the exercise there from the sawing is the thing that increased the blood flow and caused the rupture of the blood vessel? A. It very likely was a factor in it."

It is evident the trial court regarded this evidence as bringing the case within the rule announced in *Gilliland v. Cement Co.*, supra, where it was said:

"A workman's employment required him to break rock in a quarry with a 16-pound sledge and load the rock into a car which was hard work. At noon he was in apparent good health and spirits, and ate all of the lunch which his wife brought to the quarry for him. In the afternoon, while at his working place, and shortly after he was seen beating a large rock with his sledge, he suffered a pulmonary hemorrhage, from which he died before medical aid could reach him. He had been working in the quarry for several months, and before that had worked for three years in the sacking department of a cement plant, an exceedingly dusty place. *Held*, the facts stated indicated injury by accident, and injury arising out of the employment, within the meaning of the first section of the workmen's compensation act." (Syl.)

And in the opinion it was said:

"The defendant insists that the workman died of disease; that is, the injury did not arise out of the employment. The question was one of fact, and should have been submitted to the jury. It is not material that the workman's blood vessels were weakened by disease, or that he was predisposed to hemorrhage because, for example, he had breathed the dust of the sacking department for three years. The statute establishes no standard of health for workmen, entitling them or their dependents to compensation, and if the added factor of physical exertion in the employment were required to effect the lesion, and did so, the injury arose out of the employment. That the injury occurred in that way, and is referable to a definite time, place, and circumstance, is indicated by the workman's apparent good health and strength, the suddenness and profusion of the hemorrhage, the absence of previous extravasation of blood, and other circumstances." (p. 778.)

The following cases also support this rule: *Baggot Co. v. Industrial Com.*, 290 Ill. 530; where there was a rupture of the aorta by increased blood pressure due to the effort of a workman in operating a windlass to lift a heavy weight in the regular course of his employment. *Southwestern Surety Ins. Co. v. Owen*, 198 S. W. 662 (Tex. Civ. App.), where an employee, while lifting heavy cans of

paint, strained himself and caused a blood vessel to burst in his lungs. *Clark v. Lehigh Valley C. Co.,* 264 Pa. St. 529, where an employee, while engaged in his work, died from a rupture of the aorta caused by extra effort in vomiting. *State, ex rel., v. District Court,* 137 Minn. 30, where an employee was stricken with the rupture of a blood vessel while wheeling a heavily loaded wheelbarrow, there being medical testimony that the rupture resulted from the exertion. *Crosby v. Tharp Hawley & Co.,* 206 Mich. 250, where a traveling salesman suffered paralysis due to the breaking of a blood vessel in his brain, caused by overexertion and excitement in hurrying to catch a train. *Clover Clayton & Co. v. Hughes,* 3 B. W. C. C. 275, where the workman was suffering from an aneurism in such an advanced stage that it might have burst at any time and it burst while he was engaged in tightening a nut which caused a strain ordinary in his work; and other cases collected in the notes of 7 A. L. R. 1614, and 20 A. L. R. 44.

Under the above authorities we cannot say that the trial court did not have sufficient evidence on which to base its finding in this case, and its judgment is affirmed.