No. 32,680

GUADALUPE VERA, *Appellee*, v. SWIFT & COMPANY and THE
SECURITY MUTUAL CASUALTY COMPANY, *Appellants*.

(56 P. 2d 96)

Opinion filed April 11, 1936.

*Russell Field,* of Kansas City, Mo., for the appellants.

*George H. West, P. W. Croker,* both of Kansas City, *Frank W. McAllister, G. W. Humphrey, John B. Pew, James W. Broaddus* and *Joseph R. Stewart,* all of Kansas City, Mo., for the appellee.

The opinion of the court was delivered by

BURCH, C. J.: The proceeding was one by a widow for compensation for death of her husband, Juan Vera. Vera was an employee of Swift & Company, who worked in the meat packing plant of the company in Kansas City. The claim for compensation was based on accidental injury sustained when an elevator, which Vera was operating, fell. The compensation commissioner denied compensation on the ground death did not result from accident. The district court reversed the compensation commissioner and awarded compensation.

On Saturday, July 15, 1933, while washing windows at his home, Vera fell from a ladder, cut his hand on window glass, and barked both shins on a brick walk. On Monday morning, July 17, Vera came into the plant and was treated for the laceration of his hand. Vera then pulled up his pants legs, and disclosed abrasions on both shins. These were cleansed with alcohol and painted with mercuro-

chrome. The next day, July 18, the wounds were treated again. Vera did not report for further treatment.

Vera continued to work at the plant until the afternoon of Thursday, July 27. On that day he left the plant after 4 p. m., and walked home, arriving about 5 p. m. He was accompanied by his brother-in-law, Manuel Flores, who saw him again that night at supper. After supper Vera smoked a cigarette and sat around. Mrs. Vera said that when her husband came home, he was sick, went to bed, felt pretty sick, and asked for aspirin.

Some time after Vera arrived at his home on July 27, his wife saw his left leg. On the back part, behind the knee, he "had a kind of redding." It was just a little red. The next day it was swelled up worse. Mrs. Vera saw the place three times before Vera was taken to a hospital on the afternoon of July 30.

On Friday, July 28, Mrs. Vera called Doctor Jaime, of the Kansas City General Hospital, who came in the afternoon and found Vera a very sick man, with a fever of 103 degrees, and a pulse of 110. Vera complained of some chest pains, and Doctor Jaime thought he might be threatened with pneumonia. Doctor Jaime examined no part of his body except the chest. Vera did not mention his leg, or any accident, or previous sickness.

Flores saw Vera the night of July 28. Vera was in bed. The next day, July 29, Flores saw Vera and Vera showed the red spot on the under side of his leg. It was a small, red place, red and swollen a little bit, but not much. It was a red spot, and Flores called it a pimple, because that was the closest name he had for it. The skin was red around the pimple.

On July 30 Vera was taken to the Kansas City General Hospital in a hospital ambulance. He was admitted at 6 p. m., and at 6:10 p. m. his temperature was 105 degrees.

The hospital record of the physical examination which followed was that Vera had a healed scar on the right tibia; an inflammatory lesion on the left tibia; a small inflammatory mass on the postmedian surface of the lower left thigh; red streaks to the groin; unable completely to extend the left leg.

When admitted to the hospital Vera gave as his complaints chills and fever—three days. Nausea and vomiting; distention three days. Diarrhea ten days. The following is his story entered on the hospital record:

"Patient works at Swift's—Thursday noon three days ago, patient began

about noon to have a chill—felt weak and feverish—started home—fell and bumped left leg—nauseated—vomited. Thursday night more chills, fever, excessive perspiration, weakness, nausea and vomiting. Friday seen by G. H. sick car M. D. Unable to move bowels without enema, whereas for previous week he had a diarrhea 6-8 x daily. Complaints continued Saturday and today."

The physical examination was made by Doctor Lander, of the hospital staff. He testified concerning the healed scab on the right tibia, said the lesion on the left tibia was of about the same duration, but was larger and was red and angry. Concerning the inflammatory mass on the under side of the left leg, Doctor Lander said:

"That mass was about the size of a lemon; it was completely subcutaneous; there was no abrasion over that at all, and it was a completely subcutaneous abscess. The overlying skin was red, and very tender. It involved the tissues so much that he couldn't extend the leg."

Doctor Lander also testified concerning the red streaks extending from the inflammatory mass to the groin, and said Vera had tender, enlarged lymph glands in the left groin. The doctor also said the distention shown on the record was bowel distention.

The laboratory report, shown on the hospital record, dated August 1, disclosed Vera was suffering from short chain streptococcus infection. Doctor Poorman, chief of the medical staff of the hospital, saw Vera on August 1, and said Vera then had an abscess deep in the left pelvic region.

On August 1, Vera was removed from the General Hospital to Bethany Hospital, where he was entitled to treatment as a member of an employees' benefit association.

Vera's chief complaint, shown by the Bethany Hospital record, was that he hurt his left leg. He fell from steps on Thursday, July 27. He was able to get up and walk home. He did not notice the pain in the left leg until he reached home. That evening he felt bad, on account of some chest condition—felt chilly. The physical examination, shown by the Bethany Hospital record, disclosed the left leg was swollen and red and tender, and the left inguinal glands were enlarged. The laboratory report, dated August 3, showed positive for short-chain streptococcus. As a result of this infection, Vera died on August 18.

We have here a perfectly clear and adequate account of the origin, progress, and fatal termination of streptococcic infection. The fall from the ladder at home on July 15 produced an abrasion on the left tibia which did not heal, and when Vera was admitted

to the General Hospital the place was red and angry. That was the "port of entry" for the infection, which spread upward. Nature tried to arrest progress of the infection at the point back of the left knee, but could not. Red streaks went on upward, the inguinal glands enlarged; by August 1 he had an abscess in the pelvic region, and ultimately the pleural cavity filled, causing death. Meanwhile, all the characteristics of the infection were regularly and successively manifesting themselves: diarrhea six to eight times a day for a week before July 27, the day Vera went home sick, chills, fever, nausea, profuse perspiration.

As indicated, Vera was admitted to the General Hospital on the evening of July 30, and on August 1, he was seen by Doctor Poorman. In his testimony Doctor Poorman located the port of entry of infection at the place on the under side of the thigh. He told about the protection the skin affords against disease-producing bugs, which are not feared unless there is an abrasion, or broken skin. He said there was an abrasion which had produced what would commonly be called a little festered sore. The broken or abraded place was to the inner side and lower part of the left thigh. Doctor Poorman did not observe the scar on the right tibia, and the inflammatory lesion on the left tibia:

"Q. This is certain, isn't it, Doctor, that if a man receives an injury whereby he has a breaking of the skin on the right tibia and an inflammatory lesion on the left tibia, besides these cuts on his hand, that would be an avenue where the germ could enter, would it not? A. If you mean to say that that man had such a thing, I didn't see it."

His examination shows further that Doctor Poorman had not previously made himself familiar with the hospital record, but he proceeded to instruct the compensation commissioner as follows:

"He had a general septicemia. That means a general blood poisoning, coming from a broken skin to the inner side of the lower part of the thigh, and that it partially localized, in the way of gland infiltration, with an abscess in the left pelvic region."

In this connection, some observations concerning the testimony must be made. Mrs. Vera saw Vera's leg three times after he came home sick on July 27, and there was no abrasion on the under side of the left leg. Flores saw Vera's leg while he was at home, and described nothing resembling an abrasion. When Vera entered the General Hospital, and a complete physical examination was made, there was no abrasion on the under side of the left leg. The place on the under side of the left leg was definitely described as completely

subcutaneous. Vera himself detailed characteristics of septicemia, which had been revealing themselves before he went to the hospital. When taken to Bethany Hospital, Vera was examined by Dr. L. D. Mabie, who observed the inflammatory mass on the postmedian surface of the lower left thigh, above the knee. He said there was no breaking of the skin at that place then. The accident which was the basis of the claim for compensation will be described presently, and it may as well be said here, there was no testimony from which speculation or conjecture could invent an abrasion on the under side of Vera's left leg as a result of the accident. Since Doctor Poorman did not take into account physical evidence he did not see, and which, in view of the full history of the case, was indispensable to a correct diagnosis, his location of the port of entry went out of the case.

The General Hospital record disclosed a physical condition which might indicate some trouble with the left kidney. Doctor Poorman discussed the subject of trauma affecting the tissues of the left kidney. The testimony was undisputed no blood was found in the urine, and kidney lesion went out of the case.

On July 27, a freight elevator in the Swift plant, which Vera was operating, descended from the sixth floor to the elevator pit, bounded upward about a foot and a half, and then settled down. The elevator was loaded with several hundred pounds of meat.

July 27 was the first day Vera had operated the elevator. The elevator was a friction elevator, operated by means of a lever. To go up, the operator pulls down the lever and sits on it. The cage then goes up as fast as the motor will carry it. To go down, the lever is released, and the speed of descent is controlled by the operator. If the lever is completely released, the cage will go down as fast as it can go. There are automatic dogs in the guides, and if the rope should break, the dogs would set immediately, and stop the cage. There is a hand brake, with a ring above the operator's head, for him to grasp. If that be pulled, the dogs are set and the elevator stops.

Vera was instructed in operation of the elevator before he commenced to run it—going up and down several times, with and without loads. The instruction was given by the master mechanic, who stayed with Vera until the millwright came to instruct Vera further, and to give him authority to operate the elevator.

The elevator was promptly inspected after the accident. Inspection revealed there was nothing wrong with it, no repairs were

made, and Vera ran the elevator during the afternoon, until he went home.

Jose Cervantes was in the elevator with Vera. Cervantes testified through an interpreter, who would tell what the witness said instead of repeating the words of the witness. Cervantes testified as follows:

"Q. What time of day did the fall of this elevator happen? A. It was between 11:30—and then he said near 12 o'clock."

The master mechanic, who inspected the elevator after the accident, said the time when he went to the place where the elevator was resting after the fall was very near 11:30 a. m. He said he could not tell "close" because he did not look. The assistant foreman said the time was before noon, just a little before noon, he could not remember the exact time.

There was no testimony respecting degree of release of the operating lever, or which gave the speed of the elevator at any point in the course of its descent. There was no testimony that there were springs or shock absorbers at the elevator pit, or which could account for the resilience, if it was resilience, which was displayed. A few days before his death Vera told Flores that when the elevator started down, it went on down to the pit, and he could not control it. Flores' account of the conversation included nothing about speed or any rebound.

As indicated, Vera operated the elevator that afternoon as if nothing had happened. He walked home, Flores accompanying him, a distance of about a mile. There was no reference to a fall of the elevator, so far as the record discloses. When Vera reached home he said nothing to his wife about an elevator accident. That evening, sitting around and smoking, Vera said nothing about an elevator accident. During the days Vera remained at home he said nothing about an elevator accident to his wife or to Flores, or to Doctor Jaime. On July 30, when telling his story at the General Hospital, he said nothing about an elevator accident. When Vera was taken to Bethany Hospital and told his story again, he said nothing about an elevator accident. At both hospitals Vera told of a different kind of fall. At the General Hospital he said he started home, fell and bumped his left leg. At Bethany Hospital he said he hurt his left leg, fell from steps, was able to get up, and walked home. So far as the record discloses, aside from those at the packing plant who knew what occurred, nobody heard about an elevator

accident until a few days before Vera's death on August 18. Vera then mentioned the elevator fall to his wife merely as an incident in an unlucky day. Mrs. Vera testified:

"Q. Go ahead and tell what your husband said other than what you have already told, there at the hospital on that day five days prior to the time of his death. Go ahead and tell in your own way. A. You want me to tell about he fell down the steps? He talked to me about what happened, the way he fell, at the hospital, over there to the packing house. He says he had pretty bad luck that day, he fell down first from the elevator, from the sixth floor to the basement, and then after getting—and then when he went to eat lunch he started to have chills and fever, and he didn't feel like eating, just had a cup of coffee that day and he was going to ask the boss to come home; and when he finished lunch he went into the elevator and hit the iron steps on his knees. He was just talking about me living and that's all, that he was going to die, and he didn't know he was going to cause his death, that hurt in his leg."

. . . . . . . . . . . . . . . .

"No, he didn't say anything else just what happened to him, he fell down you know.

"He told me that, that is all he told me, that he didn't thought he was going to die, just for that leg he got hurt, he didn't think he was going to be so sick from that."

It will be recalled that in giving the onset of his trouble at Bethany Hospital as a fall from steps, Vera said he did not notice pain in his left leg until he reached home. When he reached home he showed his leg to his wife, and the inflamatory mass on the under side of his left leg was beginning to form. When he got to the hospital the place was so bad he could not extend his left leg, and there were red streaks running to the groin. By August 1 he had an abscess in the pelvic region. Five days before his death it was the hurt in his leg which made him so sick he was going to die.

Flores testified as follows:

"Saw deceased in Bethany Hospital five times. Talked to him two days before he died. He called for a priest three or four days before he died. He told me that they put him to running an elevator, that he was not experienced about it, but he was up against it and he would try anything once, didn't want to say no or anything like that, but he would try it and he was running the elevator there, over at the dry salt, and he did not know whether the load was too heavy, the cable slipped on him or something. Anyway, Juan got on the elevator and when it started down, it went on down to the pit and he couldn't control it. It went on down to the pit is what he told me and that he bruised his leg some place (indicating), and then after that when he went to shut the motor off when he was going home, and when coming down the iron steps there, he slipped and kind of strained or jerked a part of his leg up in here somewhere (indicating)."

It will be observed that Flores puts in a bruise somewhere in the leg, and what Vera had told both hospitals was a fall becomes a slipping and a strain up in his leg somewhere.

In this instance the compensation commissioner did not follow his usual custom of making a record of the places to which the witness pointed. It would be interesting to know whether the places were the back of the left leg, and the groin.

It was easy for Vera, on reflection, to translate pain in his leg, felt in the evening after he had a fall, into pain in his leg caused by a fall. Numerous persons examined Vera's leg. Flores himself was the second. Nobody ever saw anything which looked like a bruise on Vera's leg. The compensation commissioner found there was no accident causing death. The district court did not predicate its award of compensation on any injury to Vera's leg, or injury to any other portion of his body, and any actual bodily hurt such as bruise or strain, caused by the elevator accident, went out of the case.

There was expert testimony that the period of incubation for short chain streptococcic infection varies from almost instantly to a long time, depending on factors which were enumerated, and the time for incubation after July 15, and before July 27, was normal. Experts agreed that shock of a severe fall might cause a latent infection to flare up and become active, and the crucial question in the case emerges: What, if any, effect did the fall of the elevator have on the streptococcic infection at whatever stage it had reached when the fall occurred?

Vera commenced work at the plant at 8 o'clock in the morning of the day the elevator fell. He said that about noon he began to have a chill, and felt weak and feverish, which was near to the time the elevator fell. How near to noon Vera went to lunch was not disclosed. Vera's wife said that when he went to eat lunch he started to have chills and fever. Vera said that when he started home he fell and bumped his leg, was nauseated and vomited. That night he had more chills, fever, excessive perspiration, nausea and vomiting. He also had bowel distention, and for a week before the accident had excessive diarrhea. A doctor who was a witness for the company and who is quoted in the brief for claimant, testified:

"Q. Let's take them separately. What bearing has this question of diarrhea as a symptom? A. Acute infections as a rule cause an inflammation of the bowel, and the diarrhea is a consequence of the infection.

"Q. What about chills and fever? A. It is a natural reaction of the body to fight infection.

"Q. What about the nausea and vomiting? A. It is caused by the toxemia produced by the infection."

The term "shock" was used in the testimony. If the elevator fall were hard enough, the effect would be shock. Shock might be felt in the feet, or ankles, or knees, or hips, or back, and there might even be brain concussion if the shock were severe enough. The term is defined in Webster's New International Dictionary, 2d ed., as follows:

"7. *Med.* A state of profound depression of the vital processes of the body characterized by pallor, rapid but weak pulse, rapid and shallow respiration, restlessness, anxiety or mental dullness, and sometimes nausea or vomiting. The total blood volume is reduced. The blood pressure is low and the temperature subnormal. . . ."

Shock may also consist in sudden and violent agitation of the mental and emotional sensibilities.

Shock would not cause practically contemporaneous bowel distention. It would not cause diarrhea for a week before the shock occurred. It would not cause an inflammatory mass to begin forming on the under side of the leg before night of the day the shock occurred. There was testimony to the effect nausea and chills on July 27 might be attributed to septicemia and might be attributed to shock.

The judgment of the district court rests on the fact the fall aggravated the condition Vera was in when the fall occurred and became a contributory factor to his death. This conclusion rested on testimony the shock of the fall lowered resistance to invasion of the infection.

Dr. P. M. Krall, a rebuttal witness for the claimant, testified that shock will very decidedly lower a patient's resistance to infection. He said mere handling of the patient in moving him from his home to the hospital would lower his resistance, and the infection would become overwhelming. Vera was not only moved from his home to the General Hospital on July 30, but he was moved from the General Hospital to Bethany on August 1, and so, according to the doctor, two causes of death, other than the fall, were introduced into the picture. They were eliminated by the findings of the district court.

Doctor Krall testified that such a shock as Vera sustained when the elevator fall occurred could well lower his resistance so that if the infective organism were present it would undoubtedly enhance the activity of that organism. As indicated, the infective organism was present when the fall occurred.

Doctor Lander, testifying for Swift & Company, said if there was diseased tissue in the body, it was possible the fall would aggravate it. A fall such as Vera had might aggravate such a condition as he had, and could have aggravated a preëxisting streptococcic infection within his body. The doctor also testified as follows:

·"Q. What about the proposition of the trauma that this man sustained on the 27th day of July, 1933, when he fell these several flights? Does your science teach that a traumatic injury or a shock such as one would receive falling in an elevator has a tendency to light up or aggravate a preëxisting condition? A. That is common, to find cases like that.

"Q. It is common to find cases of that kind? A. Yes.

"Q. So that it is your opinion, if I understand you correctly, that this fall that Juan Vera sustained at Swift & Company's plant on the 27th day of July, 1933, could have activated or aggravated a preëxisting streptococcic infection that was within the body? A. I think it is possible."

The doctor also gave it as his opinion he did not believe the fall had such effect.

Doctor Jaime, testifying for Swift & Company, said:

"Q. On the 27th of July, 1933, when the elevator fell with him it is your firm belief he was then possessed of the streptococcic infection, isn't it? A. Yes, sir.

"Q. And that the period of incubation was something like seven to twelve days? A. Yes, sir.

"Q. Would a fall such as described to you, six or eight floors, have a tendency to aggravate or light that thing up and make it flare up? A. Yes.

"Q. It would? A. Yes.

"Q. In other words the streptococcic infection might be lying dormant? A. Yes, sir.

"Q. And this trauma which I have described might have lighted it and flared it up? A. Yes."

The infection was not lying dormant at the time of the fall. The period of incubation had passed, but the doctor's testimony is open to the interpretation that the fall would have a tendency to aggravate streptococcic infection present in the body.

The brief for claimant refers to no testimony relating to aggravation of the condition Vera was in when the fall occurred, except the testimony of Doctors Jaime, Lander and Krall, which has been presented.

Pneumococci, always present in the lungs, may become active as the result of lowered resistance produced by shock. When Doctor Jaime saw Vera at his home on July 28, Doctor Jaime believed Vera was threatened with pneumonia. The doctor testified as follows:

"Q. When you saw him why did you come to the conclusion that he might be threatened with pneumonia? A. When I saw the man he complained of a severe pain in his chest.

"Q. His complaint was in the chest? A. A very severe pain in his chest, headache and difficult breathing, and the temperature he had, with the symptoms that I described to you a while ago, could very well be applied to pneumonia, although as I have stated before, I was not sure whether he had pneumonia or not because my physical findings did not show enough to make a fine diagnosis."

When Vera was examined by Doctor Lander at the General Hospital on July 30 the doctor found some rales, and thought it possible Vera might have some pneumonia. Further symptoms of pneumonia did not develop.

There was much medical expert testimony that the elevator fall was not a factor in causing Vera's death.

The foregoing embraces an enumeration of the material portions of the evidence adduced at the hearing before the compensation commissioner, and an effort has been made to present the evidence in such a way its effectiveness may be comprehended.

The district court made the following findings:

"That the award of the commissioner of workmen's compensation, made and entered on the 17th day of February, 1934, wherein said commissioner denied an award of compensation to claimant, be, and the same is hereby set aside, the court believing it would be a violation of justice to permit this award to stand.

. . . . . . . . . . . . . . .

"It is further found, adjudged and decreed by the court that the deceased, Juan Vera, husband of claimant herein, met with an accidental injury on July 27th, 1933, while in the employ of Swift & Company, respondent herein, in that a loaded elevator on which Juan Vera was the operator fell a distance of six or seven floors, striking the bottom with such force as to cause it to rebound several feet upward and settle back down, and that such fall was a contributing cause to Juan Vera's death, which occurred on August 18th, 1933, and aggravated the condition in which Juan Vera was in at the time of such fall, Juan Vera never having worked after the 27th day of July, 1933, the date of the elevator's descent."

The observation that it would be a violation of justice to permit the award of the compensation commissioner to stand determined nothing. If the elevator fall was a factor contributing to Vera's death, the claimant was entitled to compensation; otherwise, not.

The observation that Vera did not work after July 27 explained nothing. It merely raised the question, What was the reason he did not work? Considering the condition he was in before he

commenced work on July 27, it would not have been strange if he had failed to report for work that morning. If, during the day, the infection so manifested itself that he went home sick, and notwithstanding the elevator fall, he was unable to return to work, failure to return to work would be accounted for by the infection.

The finding respecting the action of the elevator was not supported by any evidence. The fall was from the sixth floor. When the cage struck bottom, it did not rebound several feet upward. Vera did not mention rebound at all. The only other man who knew what occurred was Cervantes. His testimony was:

"The elevator, after striking the pit, bounced upward about a foot and a half."

In considering what was spoken of in the course of the hearing as "flare up," flare up might not be enough. It might be inferred that from some cause, perhaps shock, the pneumococci flared up, and caused incipient pneumonia, which, however, did not pass the initial stage.

Mere aggravation of a previous condition might not be enough. If, notwithstanding the fall, the streptococcic infection had gained such headway it would have progressed steadily to fatal result, the fall was not a cause of death. To be a cause of death, the fall must have constituted a new factor which operated on the existing condition in such a way that it made a substantial contribution to the ultimate result.

There is no indication the court did not know what the legal standard of cause is. Whether the standard was met was a question of fact. The court found the standard was met, and distinctly found the fall was a contributing cause of Vera's death.

The employer argues that the decision of the district court was the product of speculation and conjecture.

The evidence was, the elevator did descend, without control, from the sixth floor to the elevator pit. Something happened, because the elevator was immediately inspected. It must also be accepted as proved that the elevator did bound up about a foot and a half. One man was hurt, and shock of much severity was a necessary consequence. While Vera was not loquacious about the fall—perhaps he was not proud of his ineptness in running the elevator—it would be very remarkable if so startling an experience did not profoundly affect him. After it was all over and he went to lunch it was not strange he felt weak, and could not eat, and suffered a reaction

which made him feel cold and hot—he called it chill and fever—and which later nauseated him. When the fall occurred the virulent streptococcic infection was active in his system. The infection was taking its normal course upward through the lymphatics, but aside from the port of entry it had not objectively manifested itself until it reached the point on the under side of the leg. At that point nature was trying to impound it. Swiftly after the fall the infection proceeded to run riot—inflammatory mass the size of a lemon on the leg and red streaks to the groin by the evening of July 30, an abscess deep in the pelvic region by August 1, and the battle was hopelessly lost.

The question before the court is not whether the award of the compensation commissioner or the award of the district court was the better award. The question is one of law only. Under the circumstances the court does not feel authorized to say there was no substantial evidence to sustain the finding of the district court, and the judgment for compensation is affirmed.

The district court rendered a lump-sum judgment, contrary to section 25 of the compensation law of 1927. (R. S. 1933 Supp. 44-525.) Therefore, the cause is remanded, with direction to modify the award which was made to conform to the statute.