No. 35,613

Una Vesta Carney, *Appellee*, v. Martin Hellar and The Hartford Accident & Indemnity Co., *Appellants*.

(127 P. 2d 496)

Opinion filed July 11, 1942.

*Carl I. Winsor,* of Wichita, argued the cause, and *John E. Boyer* and *Harlin E. Bond,* both of Wichita, were on the briefs for the appellants.

*George B. Powers,* argued the cause, and *Robert C. Foulston, George Siefkin, Samuel E. Bartlett, Lester L. Morris, Carl T. Smith, C. H. Morris* and *John F. Eberhardt,* all of Wichita, were on the briefs for the appellee.

The opinion of the court was delivered by

WEDELL, J.: This was a workmen's compensation case. The commissioner made an award in favor of the widow, the sole dependent of the deceased workman, which the district court approved. From the judgment of the district court and the order overruling a motion for a new trial the respondent and insurance carrier appeal.

Appellants contend the trial court admitted incompetent evidence and that the evidence was insufficient, as a matter of law, to sustain the judgment.

With respect to the last complaint it is conceded the question presented is whether deceased met his death as the result of an accident as that term is employed in the workmen's compensation act. Whether the evidence was sufficient depends upon whether the accident occurred in the course of the employment and whether it also arose out of the employment. On July 22, 1941, Benjamin L. Carney, the husband of claimant, was engaged in carpenter work on a house which was being constructed for respondent. At about eleven o'clock on that morning, he was found on the ground in an unconscious condition, leaning against a sawhorse. He was taken to a hospital and died two and one-half days later. He had been working at the southwest corner of the house where the construction of a porch had been started. The porch had not yet been roofed. July 22 was a hot day. The temperature rose from 95 degrees F. at ten o'clock a. m. to 101 degrees F. at noon. For some years Carney, according to medical testimony, had been afflicted with arteriosclerosis. He was in good spirits that morning and apparently in good health. He was fifty-two years of age. He was five feet and eight and one-half inches tall. The eaves of the house were approximately nine feet from the ground. There were boards to be sawed off on the eaves. In order to reach the boards with his saw it was necessary to stand on the sawhorse. The sawhorse was two feet high. The sawhorse, against which he was found leaning and unconscious, was not then in an upright position but was found lying on its side. The concrete had not yet been poured on the porch floor. It was a stone house and chips of stone were scattered on the ground under and around the sawhorse. The bridge of Carney's nose was cut and bleeding, having been lacerated by his eyeglasses. His right forehead, cheekbone and arm were bruised. No one saw Carney sawing the boards above his head and no one saw him fall.

The last time he was seen by a fellow-workman was three or four minutes before he was found unconscious. There was evidence that when last seen he was either on the sawhorse or getting onto it. Some of the boards on the eaves had been sawed off entirely. One board was not entirely sawed off. There had been a splinter, which extended from the end of that board, about the size of a lead pencil. It appeared the splinter had been knocked off with the hammer. The saw was found lying on the edge of the roof and the hammer was on the ground. No one other than Carney was engaged in the work of sawing boards on the eaves of the building.

There was some conflict in the medical testimony as to the cause of the workman's death. There was, however, medical testimony as follows: The immediate cause of death was a stroke or cerebral hemorrhage, following the rupture of the middle cerebral artery; death was caused by cerebral hemorrhage and stroke, secondary to hypertension. A post-mortem examination disclosed a tremendous hemorrhage and that Carney had been afflicted with arteriosclerosis, a disease of the arteries, for a number of years. Hemorrhages in the brain are caused by trauma, *by disease of the blood vessels,* or cancer growth of the brain and by infection.

Dr. Fred J. McEwen, called as a witness by claimant, frankly admitted it was impossible to say with absolute certainty what caused Carney's stroke. He stated there was "a very good possibility" that work or exercise would be a causative factor in bringing about the final hemorrhage and that such a result quite frequently happened in cases where individuals had high blood pressure and hardened arteries. He stated that was true for the reason exercise increased the blood pressure. Doctor McEwen in substance was asked whether in his opinion the work Carney was doing would be a likely factor in bringing about the hemorrhage, that is, whether it would be likely to aggravate his condition and result in a cerebral hemorrhage? The question was predicated upon the assumption Carney was standing on the sawhorse and reaching up over his head to saw the board. The answer was:

"Well, any physical exercise might not be sufficient to produce a cerebral hemorrhage, but as you have stated in your hypothetical question, this man was laboring and cutting off a cornice with a saw. . . . *That much apparently strenuous exercise* that would increase the pulse rate and raise the blood pressure *would contribute to a cerebral hemorrhage.* . . ." (Emphasis supplied.)

Appellant objected to the question upon the grounds it did not state clearly the facts in issue, assumed facts not before the court, and that it was incompetent, irrelevant and immaterial. We think the objection was properly overruled. There was circumstantial evidence in the record which showed, or tended to show, every element embraced within the hypothetical question. It was not necessary there should be direct testimony that Carney was on the sawhorse and was sawing the boards on the eaves of the house. (*Hardwell v. St. Louis S. & R. Co.,* 146 Kan. 870, 875, 73 P. 2d 1120.)

Did the record show, or tend to show, Carney's death was the result of an accidental injury arising out of and in the course of his employment? The phrase "in the course of employment," simply means that the injury happened while the workman was at work in his employer's service. The phrase relates to the time, place and circumstances under which the accident occurred. (*Cox v. Refining Co.,* 108 Kan. 320, 322, 195 Pac. 863; *Rush v. Empire Oil & Refining Co.,* 140 Kan. 198, 200, 34 P. 2d 542; *Floro v. Ticehurst,* 147 Kan. 426, 430-431, 76 P. 2d 773.) Manifestly, the accident in the instant case occurred in the course of employment.

Did the accident arise "out of his employment"? The phrase "out of employment," points to the cause or origin of the accident and requires some causal connection between the accidental injury and the employment. (*Cox v. Refining Co., Rush v. Empire Oil & Refining Co.,* and *Floro v. Ticehurst,* all *supra.*)

In determining whether there was a causal connection between the work done and the injury suffered we must of necessity consider the existing physical condition of the workman at the time of the injury. Our compensation law prescribes no standard of health for a workman. It is well settled that accidental injuries are compensable where the accident only serves to aggravate or accelerate an existing disease, intensifies the affliction or contributes to the death of the workman. (*Blackburn v. Brick & Tile Co.,* 107 Kan. 722, 193 Pac. 351; *Stringer v. Mining Co.,* 114 Kan. 716, 220 Pac. 168; *Vera v. Swift & Co.,* 143 Kan. 593, 56 P. 2d 96; *Hardwell v. St. Louis S. & R. Co.,* supra; *Williams v. Cities Service Gas Co.,* 151 Kan. 497, 99 P. 2d 822.) If a workman's existing physical structure, whatever it may be, gives way under the stress of his usual labor, his death is an accident which arises out of his employment. (*Gilliland v. Cement Co.,* 104 Kan. 771, 180 Pac. 793; *Harmon v. Larabee Flour Mills Co.,* 134 Kan. 143, 145, 4 P. 2d 405.)

It must be borne in mind, as we have repeatedly held, that this court is concerned only with evidence which proves, or tends to prove, the findings made by the trial court, and not with evidence which would actually support a directly contrary finding. (*Walker v. Finney County Water Users Ass'n,* 150 Kan. 254, 257, 92 P. 2d 11.) Unless the evidence as a whole compels a contrary finding we cannot disturb the finding made by the trier of the facts.

There was circumstantial evidence which proved, or tended to prove, Carney was reaching above his head and sawing the boards on the eaves of the house. There was direct medical testimony such exertion would increase his blood pressure and aggravate the existing weakened condition of his blood vessels. There was direct medical testimony that the rise in blood pressure, occasioned by such exertion, would contribute to a cerebral hemorrhage. It is true, as appellants contend, the cause of injury or death cannot be left to rest upon mere surmise, speculation or conjecture. (*Fair v. Golden Rule Refining Co.,* 134 Kan. 623, 629, 7 P. 2d 70; *Whitaker v. Panhandle Eastern P. L. Co.,* 142 Kan. 314, 317, 46 P. 2d 862.) It may, however, be established by circumstantial evidence and such evidence may be, and at times is, just as convincing as direct testimony. In civil cases it is not necessary that the circumstantial evidence should rise to such a degree of certainty as to exclude every reasonable conclusion other than that found by the trial court. (*Hardwell v. St. Louis S. & R. Co.,* and *Williams v. Cities Service Gas Co.,* both *supra.*)

We deem it unnecessary to review the facts contained in various cases relied upon by appellants. It is sufficient to say these decisions do not require or justify a reversal of the instant judgment.

The judgment is affirmed.