No. 37,037

Pearl A. Workman, *Appellee*, v. Johnson Brothers Construction Company and Continental Casualty Company, *Appellants.*

(190 P. 2d 863)

Opinion filed March 6, 1948.

*E. S. Hampton,* of Salina, argued the cause, and *B. I. Litowich, LaRue Royce* and *H. H. Dunham, Jr.,* all of Salina, were with him on the briefs for the appellants.

*D. E. Watson,* of Salina, argued the cause for the appellee.

The opinion of the court was delivered by

Smith, J.: This was a claim under the compensation act by a widow for the death of her husband. The commissioner of workmen's compensation and the district court on appeal awarded compensation. The respondent has appealed.

There is not much dispute about the ultimate facts. The question in the main turns on the conclusion to be drawn from these facts. It was stipulated at the outset that respondent had due notice of the accident; that the relationship of employer and employee existed; that claim was made as required by law; that the Continental Casualty Company was the insurance carrier; that deceased's average earnings were such as to entitle claimant to the maximum of $4,000, if found to be entitled to compensation, for total dependency; that no compensation had been paid; and that no medical or hospital or funeral expenses had been furnished. The sole question submitted to the commissioner was whether a personal injury by accident arising out of and happening in the course of his employment had caused the death of decedent.

There are some well-established rules by which the triers of the facts were guided. Where a workman is not in sound health and the accident suffered by him aggravates his condition so that death re-

sults therefrom his dependents are entitled to compensation. (See *Copenhaver v. Sykes,* 160 Kan. 238, 160 P. 2d 235; *Williams v. Cities Service Gas Co.,* 151 Kan. 497, 99 P. 2d 822; and *Lee v. Lone Star Cement Co.,* 142 Kan. 349, 46 P. 2d 864.)

There is no standard of health necessary to bring a workman under the statute. (See *Copenhaver v. Sykes,* supra; *Holler v. Dickey Clay Mfg. Co.,* 157 Kan. 355, 139 P. 2d 846; and *Carney v. Hellar,* 155 Kan. 674, 127 P. 2d 496.)

The right of a workman to compensation may be established by circumstantial evidence. (See *Williams v. Cities Service Gas Co.,* supra, and *Evans v. Western Terra Cotta Co.,* 145 Kan. 924, 67 P. 2d 426.)

This court in considering an appeal in a workmen's compensation case will not weigh evidence. If there is substantial, competent evidence in the record to support the judgment it will not be disturbed on appeal. (See *Walker v. Arrow Well Servicing Co.,* 163 Kan. 775, 186 P. 2d 104; and *Cooper v. Helmerich & Payne,* 162 Kan. 547, 178 P. 2d 242.

We have many times passed on what is an accident under the compensation act.

In *Gilliland v. Cement Co.,* 104 Kan. 771, 180 Pac. 793, we had a record where a workman in a cement plant was found while at work bleeding from his mouth and nostrils. He died soon after. The employer defended the claim for compensation by arguing that there was no evidence that the workman had suffered an accident. The statute at that time provided:

"If in any employment to which this act applies, personal injury by accident arising out of and in the course of employment is caused to a workman, his employer shall, subject as hereinafter mentioned, be liable to pay compensation to the workman in accordance with this act." (p. 773.)

On the question of whether there was any evidence of an accident we said:

"The word accident does not have a settled legal signification. It does, have, however, a generally accepted meaning, which is the same whether considered according to the popular understanding or the approved usage of language. An accident is simply an undesigned, sudden, and unexpected event, usually of an afflictive or unfortunate character, and often accompanied by a manifestation of force. The word undesigned must not be taken too literally in this connection, because a person may suffer injury accidental to him, under circumstances which include the design of another. The same warning may be extended regarding other elements of the definition; but as definitions go, the one here proposed is correct, at least for present purposes. In this in-

stance all the characteristics of an accident were present. The occurrence was sudden, unexpected, and undesigned by the workman. While no one saw the workman strike a blow with his heavy sledge, or lift a piece of rock the moment before the hemorrhage occurred, the circumstances are clearly such that the jury would have been authorized to relate the hemorrhage to blood pressure intensified by a vigorous muscular exertion. Relating the hemorrhage to physical exertion, rupture of the pulmonary blood vessel by force from within was as distinctly traumatic as if the canal had been severed by the violent application of a sharp instrument from without. There was no direct evidence of extraordinary exertion suddenly displayed. When last observed, the deceased was working in the manner habitual to the employment. The fact remains, however, that an extraordinary and unforeseen thing suddenly and unpremeditatedly occurred, and presence of all the essential attributes of accident cannot be gainsaid." (p. 773.)

We have ever since consistently followed the theory there expounded. (See *Stringer v. Mining Co.,* 114 Kan. 716, 220 Pac. 168; *Gililand v. Zinc Co.,* 112 Kan. 39, 209 Pac. 658; *Riggs v. Ash Grove L. & P. Co.,* 127 Kan. 91, 272 Pac. 153; *Shapland v. Ferguson Furniture Co.,* 139 Kan. 758, 33 P. 2d 145; and *Harmon v. Larrabee Flour Mills Co.,* 134 Kan. 143, 4 P. 2d 406.)

With these rules in mind we shall examine the record.

Deceased was a carpenter. On the day of his death he was employed in setting nails, a process by which he held a punch over a nail that had already been driven into the wood and struck the punch with an ordinary carpenter's hammer, driving the nail a little further into the wood. He was working in a basement on some shelves or bins which required him to stoop down to the floor at times and at other times to stand up and raise his hands as high as his shoulders. On the evening before his death deceased, when he came home from work and while washing, complained of a severe pain in his chest. His face was pale and his lips blue. During the course of this hearing this was sometimes referred to by the doctors as coronary occlusion or coronary thrombosis. He went to work the next morning. The last time he was seen alive was about three o'clock in the afternoon. About four o'clock the same afternoon he was found lying down in one of the aisles in which he had been working. The record is not clear as to whether he was still alive but at any rate he never did regain consciousness. The aisle in which he was found was different from the one in which he was working when seen at three o'clock. The electric light over the aisle where he was found was burning. It was the only light burning in the basement. The above facts are undisputed.

Was there a causal connection between the work claimant was doing and his death? On this question we have the testimony of two doctors, one put on the stand by the claimant and one by respondent. It is not unusual for doctors to differ sharply in their testimony in cases of this sort. Such is not true of these doctors, however. In answer to hypothetical questions they both testified that deceased had a coronary occlusion on the evening before his death, the next day, and died from heart failure following coronary thrombosis. Both testified that he should have been put to bed and kept quiet and that when a man is in that condition a very slight activity would result in his collapse.

The trial court made exclusive findings of fact on which the award was based. In finding 6 the court in referring to the testimony of the doctor put on the stand by the claimant said when asked whether or not using the nail punch as heretofore described could contribute to the heart failure the doctor first stated "Possibly." He then further testified (the court then quoted from the testimony of the doctor) as follows:

"I think that (using the nail punch) could be considered as a contributory fact to his sudden collapse, the sudden heart failure which he evidently had."

Doctor Anderson further testified:

"Q. Assume that Mr. Workman had had a coronary occlusion or coronary thrombosis on the preceding evening, which would be October 8, 1946, and all other things being equal, he would some day die of coronary failure, coronary occlusion, or some failure of the circulatory system; do you have an opinion as to whether or not the work just related to you in which Mr. Workman was participating at the time of his injury by accident intensified, accentuated, aggravated, or accelerated his disease so as to cause his death at the time mentioned?

"Mr. Hampton: Object to that as incompetent.

"Commissioner Wyman: Overruled.

"A. That is entirely probable."

The court then referred to this doctor's testimony as follows, when asked if he knew whether or not there was any causal connection between the work the deceased was doing and his death, the doctor states:

"I stated that the probability, his working, made the event come on perhaps quicker."

In referring to the testimony of the doctor who was put on the stand by respondent the court said, when asked if it was possible that the

work deceased was doing would precipitate the immediate occlusion, would cause death the doctor testified:

"Yes, it is possible."

The court further quoted this doctor as follows:

"Q. Would you say that it is probably to the extent—is it close to the point of certainty that that would have been the producing cause or the sole cause? A. That is a little bit difficult. It certainly is possible that any exertion of any kind at that time would be the precipitating factor, or the final straw resulting in his death.

"Q. Would that type of exertion which I have described to you be any more likely to result in death than the exertion which he did incur by walking up and down the stairs, or by dressing, or——? A. I would say it would be less likely than walking upstairs, and possibly a little more likely than coming down.

"Q. And opening a car door, or dressing, or a number of things of that nature? A. I believe I better answer that question in this way: That with a person with a known coronary occlusion in the hospital we usually have them on liquid diet in order to relieve the strain of digesting solid food. We also keep them absolutely flat in bed or propped in the most comfortable and relaxed position in order to avoid any strain that we can possibly avoid.

"Q. It is true any strain of any kind would be dangerous to a person who had suffered a coronary thrombosis or occlusion? A. That is the fact upon which we base our treatment.

"Q. Would a sneeze produce the same result? Is it possible that a sneeze would produce such a result? A. A sneeze, straining at the stool, an emotional flareup, any of those have at times produced sufficient strain to be the final precipitation factor.

"Q. Would you say in the ordinary instance then that it was possible that this might have caused it, but not probable? A. I would say that it is probable —it certainly is probable and is probable insofar as they apparently were coincidental.

"Q. Judging from the result— A. Judging from the fact that he was doing that and died, on the face of it at least there is some connection."

The respondent's doctor also testified, in part, as follows:

"Cross-examination

"Q. Since he had had the occlusion the night before, and I think, if I remember correctly, you stated that from the hypothetical question given you by Mr. Dunham, you thought he had his occlusion on the night of the 8th. (T. 67.) A. Now, what I mean to say in my answer to the previous question was inasmuch as he was countersinking nails, as far as we know, at the time death occurred, that on the face of it at least there is a connection. Do you want me to amplify that a little farther?

"Q. A connection between the exercise— A. There must have been some connection—or there is obviously some connection, inasmuch as they occurred at the same time.

"Q. You mean between the exercise ——? A. Between countersinking nails and his sudden death. (T. 68.)

"Q. What do you mean by that? What we are trying to find out, was there any connection between what he was doing, hammering those nails and the cause of his death? That is the question of law involved here. A. I see. I believe, sir, that under those circumstances I would have to answer yes, because of this fact, that properly treated he would not have been exerting himself in any way.

"Q. Of course, we have got to leave out the matter of whether he was properly treated. A. I am speaking from my standpoint, of course.

"Q. You are speaking from the medical standpoint of what could have been done for him. A. That is right.

"Q. But legally, we want to know, did this punching of the nails aggravate his condition in any way, or hasten the cause of his death in any way in your opinion. (T. 69.) A. I think if that is the point involved I would have to answer, yes it did. (Emphasis supplied.)

"Q. Well, that is what we want to know. A. Just as climbing a stairway or anything else would."

When we consider this evidence, together with the admitted facts, that deceased was seen to be working about an hour before he was found stricken, that he was working up one aisle and down another and the light was turned on over the aisle where he was working and his hammer was there by him, a reasonable conclusion to be drawn therefrom is that he had been working at the time, or about the time of the fatal attack. We have no trouble in concluding that there was substantial, competent evidence on which to base an award of compensation to the claimant.

The judgment of the trial court is affirmed.