No. 39,713

MARY NEFF, Widow, and Guardian of BILLY LEE NEFF, minor dependent (William L. Neff, deceased), Claimants, *Appellants,* v. HENRY WAGNER TRANSPORT COMPANY, Respondent, TRI-STATE INSURANCE COMPANY, Insurance Carrier, *Appellees.*

(281 P. 2d 1109)

Opinion filed April 9, 1955.

*Harold Gibson*, of Lyons, argued the cause and was on the briefs for the appellants.

*Max Wyman*, of Hutchinson, argued the cause, and *Don Wyman*, also of Hutchinson, was with him on the briefs for the appellees.

The opinion of the court was delivered by

HARVEY, C. J.: This is a Workmen's Compensation case. Mary Neff, the widow of William L. Neff, on her behalf and as guardian of their minor child, filed a claim for compensation for the death of her husband who died at a hospital in Wichita of spontaneous subarachnoid hemorrhage on October 17, 1953. To get a basis for the claim they go back to August 28, 1953, for the action.

A general statement obtained from the record may be summarized as follows: William L. Neff was born at Little River, Kansas, and spent most of his life in that vicinity and about Lyons, Kansas, where he lived at the time of his death. He spent 4 years and 10 months in the Army during World War II and was honorably discharged in October, 1945. His business was that of a truck driver. He had worked for Rice County, the State Highway Department, and the Tri State Oil Company, of Alma, Nebraska. He was married to the claimant January 9, 1950; one child was born to that union for whom claimant was appointed guardian. Neff was a rather large man, 6 feet 1 inch tall, and weighed 225 pounds. He began working for the respondent, Henry Wagner Transport Company, on March 1, 1953. He had always been in good health and boasted of the fact that he had never had to have a doctor.

On the morning of August 28, 1953, Neff had no load to haul and was putting in his time greasing his truck in one of respondent's buildings in Lyons, which was about 38 feet wide and 50 feet long, built of cement blocks, covered with a composition roof, and had a cement floor. This was work he was accustomed to. To do this there was what is called a grease gun which weighed about 80

pounds and holds 35 pounds of grease. It did not have to be moved. A hose about 30 feet long was attached to the grease gun and on the other end was a nozzle which weighed 2 pounds 5 ounces. The method of greasing the truck was to lie down on a scooter which was about 18 inches wide and 36 inches long with a headrest of sponge rubber. This was very easily rolled over the floor by use of the feet. The method of using it was for one to lie on his back, take the nozzle, scoot himself around where he needed to be, place the nozzle up to the place he wanted to grease, press the nozzle and grease would come out. The work was not regarded as difficult. He began the work about 8:00 o'clock in the morning and about 10:00 o'clock he and two other men who were working about the building, William Coine and Henry Wagner, went across the street for a cup of coffee. They returned in about 20 minutes and he continued to work about a half hour. He felt no inconvenience. He got up and talked to Wagner and Coine about 5 minutes when he felt a severe pain in his neck and put his hand up to his neck. One of the men asked what was the matter and he said it felt like someone had struck him in the back of the neck with an ice pick. He asked permission of Coine to sit in his car for a few minutes as he was not feeling well, and soon thereafter asked that he be taken home. Coine and Wagner took him to his home. By that time he appeared to be unconscious.

A little later Dr. Leonard, who had practiced medicine in Lyons for a number of years, was called. He reached Neff's home about 1:00 p. m. and was told that they thought he was taking polio. Neff had a severe pain in his head; was rolling from one side of the bed to the other, and was sort of irrational or unconscious. The doctor gave him a quarter grain of morphine hypodermically. Before he left Neff had quieted down. The doctor returned about 7:00 p. m. that day and at that time he couldn't see much wrong with him. He was rational; visited with the doctor, and the pain in his head was much improved.

Dr. Leonard next saw him on August 31, when Neff went to his office. Neff did not complain very much but he did say that his head hurt a little and his neck was stiff. An examination disclosed his neck was rigid, his reflexes were somewhat disturbed, his blood count somewhat elevated, and his temperature was 99½. Dr. Leonard also X-rayed his neck but the X-ray showed negative, and he then made arrangements for Neff to be taken to the polio ward at

Grace Hospital in Hutchinson where he was under the care of Dr. Paine. There his spinal test showed a large amount of blood in the spinal fluid under pressure. A diagnosis of subarachnoid hemorrhage was made with the possibility of a rupture of an aneurysm at the base of the brain. A second spinal drainage was done the following day which contained less blood. His headache and stiffness of the neck had improved and after rest and being under observation at the hospital for about a week he was referred to Dr. Bacon, a neurologist surgeon of Wichita, for further special diagnosis and treatment.

Dr. Bacon testified that Neff was admitted to the hospital on September 8, at which time he was rational and fully conscious. Neff stated that on August 28, he was suddenly struck with a headache and lost consciousness for a short time. The condition was subsequently found to be hemorrhage into the spinal fluid and the patient followed the typical average course for such a complaint. Fever, headache and a stiff neck developed and the patient's recovery to normal was gradual over a period of a week or more. The patient was referred to him at the St. Francis Hospital especially for studies of the circulation of the brain which were indicated in order to demonstrate the area from which bleeding took place. Dr. Bacon further testified:

"In none of my contact with the patient was any injury noted or claimed.

"Examination on September 8, showed the patient to be clear and alert. He was still slightly stiff. There were no neurological abnormalities otherwise.

"The diagnosis was spontaneous subarachnoid hemorrhage. There has been no reason to alter that diagnosis.

"Arteriography was performed and excellent visualization of the circulation of the cerebral hemisphere was obtained on both sides from injections of the common carotid arteries in the neck. No abnormalities were demonstrated. The patient was dismissed from the hospital on Sept. 13, to continue recovery at home."

No doctor saw Neff again until October 13, 1953, when Dr. Leonard was called to his home. He found the patient vomiting and quite sick again. Dr. Leonard put him in the hospital at Lyons. The doctor testified that something had happened again to him rather suddenly; that his breathing was disturbed, slow, his reflexes were again disturbed, and he presented a picture of something very acute. He was kept in the hospital until the 16th. Dr. Leonard visited him every day but he was gradually getting worse. The patient was returned to St. Francis Hospital in the hope he would

recover sufficiently that something could be done to prevent further hemorrhages. Upon arrival at St. Francis Hospital October 16, he was found to be in a very serious condition. The spinal puncture showed the fluid to be quite yellow in color and still slightly hazy from a hemorrhage which would be several days old and would fit the history of the hemorrhage which occurred October 13. The patient was in a high fever and was rigid in all extremities. He was much too ill for anything except conservative treatment and survived only a few hours expiring on October 17, 1953.

After the workman's death an autopsy was performed. The actual diagnosis was cerebral hemorrhage which came from an artery which carries the blood to the brain and is spoken of by the doctors as a congenital aneurysm. It was something he had had from his birth, a weak spot in the walls of the artery. The aneurysm is an enlarged place in the artery caused by a weakness or a thin place in the muscular structure of the artery. It was inside of the covering over the brain, near the bottom of the brain. It let out some blood over a small portion of the brain itself. This caused his temporary unconsciousness when he had his first attack. Sometimes the amount of the blood leaking from the artery can be assimilated. This was true of his first attack on August 28, when he was kept quiet in the hospital and rested but when the second attack occurred on October 13, much more blood escaped from the artery and caused greater injury to his brain which resulted in his death. None of the doctors would say that the work he was doing had anything to do with this break in the wall of the artery. Since he had had the aneurysm all of his life it might break at any time whether he was working or not, or even in his sleep.

The Workmen's Compensation Commissioner reviewed the evidence and allowed claimant's compensation. Respondent appealed to the district court. The district court examined the transcript of testimony taken before the Commissioner, considered the briefs submitted by counsel and their argument, and concluded there was no evidence tending to show that the workman's accident arose out of the employment; that, in fact, all the evidence was to the contrary. It, therefore, disallowed the claim for compensation and reversed the finding of the Commissioner. Claimants have appealed.

In this court counsel for appellants present for our consideration the question,

"Did the deceased die by accident within the meaning of the Workmen's Compensation Act?"

The district court decided that question in the negative. The pertinent portion of our statute, G. S. 1949, 44-501, reads:

"If in any employment to which this act applies, personal injury by accident arising *out of* and in the course of employment is caused to a workman, his employer shall, subject as hereinafter mentioned, be liable to pay compensation to the workman in accordance with the provisions of this act. . . ." (Italics supplied.)

Before a claim may be allowed the accident to the employee must have arisen *out of* employment. That is, the employment must in some way be responsible for the accident. This has been held in a number of cases. See *Bevard v. Coal Co.*, 101 Kan. 207, 165 Pac. 657; *Cox v. Refining Co.*, 108 Kan. 320, 195 Pac. 863; *Sellers v. Reice Construction Co.*, 124 Kan. 550, 262 Pac. 19; and, *Carney v. Hellar*, 155 Kan. 674, 127 P. 2d 496.

Other questions suggested by appellants are not properly before us. The trial court reviews the record of the Compensation Commissioner and passes on questions of fact and law. This court is limited to the determination of questions of law only. G. S. 1949, 44-556. See the later cases of *Hilyard v. Lohmann-Johnson Drilling Co.*, 168 Kan. 177, 211 P. 2d 89, and *Shue v. LaGesse*, 173 Kan. 309, 245 P. 2d 966.

We find no error in the record. The judgment of the trial court is affirmed.