FORDYCE LUMBER COMPANY *v.* SHELTON.

4-7309                                        179 S. W. 2d 464

Opinion delivered March 20, 1944.

*Gaughan, McClellan & Gaughan* and *Walter N. Laney, Jr.,* for appellant.

*L. Weems Trussell* and *Nona Lee Trussell,* for appellee.

HOLT, J.   The widow of Robert Shelton filed a petition with the Workmen's Compensation Commission, asking compensation under the Workmen's Compensation Law, act 319 of 1939. Her petition was first heard by the Referee of the Commission, who made a finding and entered an order denying an award. Upon an appeal to the full Commission, the action of the Referee denying the award was affirmed. Thereafter, on appeal to the

Dallas circuit court, there was a finding that there were not sufficient facts and competent evidence to support the findings of the Commission, and its order denying an award, and accordingly the circuit court reversed the order of the Commission and granted appellee and her dependent child an award against appellant. This appeal followed.

As we view the record, the question presented is one of fact. Appellant says: "There are two main points involved; first, was there an accidental injury, and second, did Shelton's death ensue as a result of the injury."

It was appellee's contention that her husband, Robert Shelton, January 28, 1942, suffered a strain or injury from lifting, which arose out of, and in the course of his employment, and that this injury caused his death, or aggravated a pre-existing diseased condition, thereby accelerating or hastening his death. In this connection, appellee's witness, Dr. White, a negro physician who attended Shelton after his alleged injury, testified that Shelton's injury caused hemorrhages from the kidneys and was the exciting cause which produced the acute nephritis from which, in his opinion, Shelton died. There was other testimony tending to support appellee's contention.

The Commission found: "Upon consideration of all the testimony and all the evidence before them, the Commission is of the opinion that the death of Robert Shelton on March 11, 1942, was caused by the natural progression of a diseased condition, wholly unrelated to the alleged accidental injury of January 28, 1942."

A summary of the facts most favorable to the findings of the Commission is to the following effect: Appellee's husband, Robert Shelton, at the time of his alleged injury was 36 years of age and had been working for appellant approximately seven years. In the morning of January 28, 1942, Shelton was assisting other employees in loading a piece of timber 6 x 6 x 10, weighing about 135 pounds, into a railroad car.

Jewell Parks, an employee, who was working with Shelton at the time of the alleged injury testified that he saw Shelton get "overbalanced and stepped off of the stack for a distance of about 3 feet and 4 inches. . . . Q. What did he do when he got overbalanced? A. Fell off. One foot hit the ground. Elgin asked if it hurt him. He told him 'just another lucky day.' Q. What did you all do the rest of the afternoon? A. We worked for awhile. When we didn't have anything else to do, we went back to our regular work, and Robert went back to his regular job. Q. Did he say anything to you about passing any blood that day? A. No, sir, didn't say anything to me."

B. A. Mayhew, appellant's manager; Hollis Burroughs, under whom Shelton was working at the time; F. A. Gordon, W. T. O'Donnell, other employees of appellant, and Dr. Ward, the first physician to administer to Shelton following the alleged injury, all testified that Shelton made no mention of any injury until some time after it was alleged to have happened. At the end of the day's work Shelton made no complaint of any injury other than a mashed finger. Two of appellant's employees with whom Shelton was working at the time complained that Shelton was not doing his part of the work. Witness Parks heard Shelton tell Hollis Burroughs that he was kind of sick that morning, didn't feel so good. Witness Harris thought Shelton was sick and not able to do much work. Witness O'Donnell testified that Shelton had worked under him since June 16 before his alleged injury; that at first he was a good worker, but got where he was weak, especially during the last thirty days of his employment, and that he would change him from time to time to different jobs in order to make it easier for Shelton. Witness Gordon testified that he got Shelton to help push the timbers and that one of appellant's employees told him, Gordon, that he might as well not have Shelton over there for the good he was doing; that he just wasn't doing anything. It was about two weeks after the alleged injury before Gordon heard that Shelton claimed an injury.

Dr. Ward saw the deceased, Shelton, on the day following the alleged injury. Shelton complained to him of his back, but said nothing about an injury. He next treated Shelton March 5, 1942, at which time Shelton had temperature. Dr. Ward never had any knowledge or report of any injury or strain suffered by Shelton, but diagnosed Shelton's case as conjective heart failure, Bright's disease, high blood pressure, with blood and albumin in the urine. Dr. Ward was also present on March 7 when Shelton was examined by Dr. Walter H. Simmons of Pine Bluff and agreed with Dr. Simmons' diagnosis. Dr. Simmons' diagnosis was "acute parenchymatous nephritis. This, of course, would be results from his mouth infection or the urinary pus infection as shown by report. Could also be result of syphilis. My opinion to him, if you care for that. 'I cannot in any sense of the word see how the strain he speaks of having had could be causative.' . . . Q. Did you find he had nephritis? A. Yes, sir. Q. Could you tell whether that was of long standing? A. I would take it that it was because it was at a terminal stage, and with an acute nephritis that would kill a man—I wouldn't think he would last two or three months, and he wouldn't show the exact signs that we got in our urinary examination. Q. What are the causes of nephritis recognized by the medical profession? A. Any poison that is constantly being poured into the system, exposure, extreme heat, extreme cold, over eating, syphilis, etc. Q. What source of infection did you find in him that might have caused nephritis? A. His syphilis, the mouth infection—which showed about every type of germ that we know. He had what is called diplococci, long and short chain streptococci, staphylococci (comes in bunches, as bunches of grapes). Found, in addition, Vincent's Agina. Believe he had more different types of germs in his mouth than I have ever seen. Q. Is that enough to kill a man, doctor? A. Yes, sir." It was Dr. Simmons' opinion that Shelton's physical breakdown was due to a continuous poisoning of the system, causing poor heart action, damage to the circulatory system, which resulted in high blood pressure, 215/150, and damage to the kidneys. He testified:

"Q. Did you think that nephritis would be caused by a strain of any kind? A. No, I don't know of any particular strain, except we might have an acute traumatic nephritis which would immediately disable a person—suffering great pain, shock, etc., as a result of his injury. Q. Do you think that a man who had suffered an injury sufficient to cause acute nephritis could have continued to work for two hours after receiving such an injury? A. No, sir. The kidney is very well protected. . . . Q. There is testimony here that he had hemorrhages from his nose, mouth and his rectum. Was he hemorrhaging at these points when you saw him? A. He was not hemorrhaging at that time, but he had blood clots which indicated he had been hemorrhaging. Q. What, in your opinion, caused these hemorrhages at those points? A. He had extremely high blood pressure, which was sufficient to break small blood vessels anywhere in the body."

We have had occasion many times to consider § 25 (b) of our Workmen's Compensation Law, especially in *Lundell* v. *Walker*, 204 Ark. 871, 165 S. W. 2d 600; *J. L. Williams & Sons, Inc.*, v. *Smith*, 205 Ark. 604, 170 S. W. 2d 82; *Baker* v. *Silaz*, 205 Ark. 1069, 172 S. W. 2d 419; *Solid Steel Scissors Co.* v. *Kennedy*, 205 Ark. 958, 171 S. W. 2d 929, and in the very recent cases of *Johnson* v. *Little Rock Furniture Manufacturing Co., ante*, p. 1016, 178 S. W. 2d 247; *Cerrato* v. *McGeorge Contracting Company, ante*, p. 1045, 178 S. W. 2d 247, and *Hughes* v. *Tapley, Administratrix, ante*, p. 739, 177 S. W. 2d 429.

The effect of our decisions is that the Commission's findings of fact must be given the same force and effect as the verdict of a jury, or of the circuit court, sitting as a jury, and consequently, the circuit court and this court on appeal, will not set aside.the Commission's findings when based upon substantial testimony.

In *J. L. Williams and Sons, Inc.*, v. *Smith, supra*, this court reversed the judgment of the circuit court which had refused to affirm the Commission's finding of fact and directed that a judgment be entered affirming the Commission's award. In that case, we said:

"Smith has no claim or cause of action except the one given him by statute, and the statute creating the claim provides, as part of and condition to the cause of action, that he can enforce such claim only before a commission whose findings of fact shall be final in the absence of fraud, and which findings can be reviewed only for errors of law and shall not be set aside if there be sufficient competent evidence to support them. The circuit court cannot go into the question of the weight of the evidence. The only issue confided, by the act, to its determination is whether there is sufficient evidence as a matter of law to warrant an honest and reasonable trier of facts in making the finding which was made. There was sufficient competent evidence to warrant the finding of fact of the commission, and the circuit court erred in setting it aside."

So in the instant case, after a careful review of all the evidence and without attempting to set out the evidence in detail, we have reached the conclusion that there was substantial evidence to support the Commission's finding, and that the trial court erred in holding otherwise. Accordingly, the judgment of the circuit court is reversed, and the cause remanded to that court with directions to enter a judgment affirming the Commission's award.

ROBINS, McFADDIN and KNOX, JJ., dissent.

---

McFADDIN, J., (dissenting). The learned Circuit Court made a careful analysis of this case and rendered a lengthy opinion, which I now copy.

*Opinion of Circuit Court*

"STATEMENT OF FACTS"

"The decedent, Robert Shelton, had been regularly employed by respondent for seven years up to and including January 28, 1942, without loss of time on account of illness. On January 28, 1942, at about 3 o'clock p. m.

and while he was helping load 6" x 6" x 10' timbers on a box car from a truck about 3½ feet high on which decedent was standing, one of the timbers became unbalanced and shoved decedent backwards off the truck on which he was standing to and on the ground and one of his fellow employees asked if he was hurt and he gazed around for about two minutes and mumbled something and said, 'Just another day.'

"Decedent remained on the job for about an hour doing very little work and began to pass blood from his kidneys that same afternoon and never worked another day. He started home and became so sick that he had to stop at a neighbor's house and rest where he again passed blood from his kidneys and thereafter reached his home where he remained until his death on the 11th day of March, 1942. The deceased was evidently badly diseased on January 28, 1942, date of injury.

"1. Myrtle Shelton testified: that she was the widow of Robert Shelton, deceased, and they had been married ten years and ten months and that she and Suzie Maxine Shelton were Robert's dependents; that Robert had worked for respondent for the last past seven years and had been regularly employed during that time; that he never lost a day except one week when he had indigestion. Pay slips showed that he worked fifty hours the last week before his injury. She offered in evidence pay-slips showing his work for 1940, 1941 and 1942.

"On January 28, 1942, Robert came home, passing blood from his kidneys and Robert said he had been lifting heavy timbers and fell off the truck backwards and felt something slip loose or tear loose in his back.

"Palmer Houston carried him to the doctor the next morning and witness went with him and in her presence decedent told Dr. Ward that he was lifting heavy timbers and fell backwards and felt something slip loose in his back and that Dr. Ward prescribed for him.

"On the next day she tried to get Dr. Ward to go to see decedent. Witness stayed at his office practically all day trying to get him to go see her husband. She told the doctor Robert was spitting up blood. The doctor told

her he would call the drug store and she went to the drug store and the doctor failed to call. The next day, which was Saturday, she went out to the mill to see Dr. Ward, got there at daylight, was the first person there, and the doctor asked her what she wanted and she told him that she wanted him to go see her husband, Robert, and the doctor told her he did not know what was wrong with him and for Robert to come to his office. Thereupon she advised Dr. Ward that Robert was not able to come to his office and the doctor refused to go see him.

"On January 29, when Palmer Houston carried her husband to Dr. Ward's office he was forced to wait from nine to twelve o'clock. After the injury decedent was extremely tender across his back, could not lie down at night and had to sit up most of the time. After Dr. Ward would not go to see him, she got Dr. White from Warren to treat him. Decedent passed blood from his nose, mouth, kidneys and bowels. Witness called Dr. Ward one night and he advised her not to call him any more at night; that the doctor's pay had been deducted monthly from decedent's pay check. That her husband died without ever recovering.

"2. John E. Jones, Negro preacher, testified that he had visited Robert Shelton after his injury and at a time when Robert knew he would not get well and at that time Robert told him he received his injury at the mill, and this witness' testimony as to the manner of the injury and its extent was the same as that of witness Myrtle Shelton, and it is therefore unnecessary to set out that evidence again.

"3. Roscoe McCrary testified that he saw Robert Shelton at Dr. Ward's office on January 29, and carried him home. Deceased made the same statement of facts to him as to how he received his injury as above stated and the same will not be restated here.

"4. Beatrice Juniel testified that she was a sister of Robert Shelton and was at his home on January 31, after the injury and Robert stated to her the manner in which he received his injury, which was as above de-

scribed, and that at that time deceased was bleeding from his mouth, nose and kidneys.

"5. Blanchie Clay testified that she had known Robert Shelton for twenty-five years and that his health had been good except for chills and fever before his injury and she heard Robert relate the manner in which he received his injury while working for respondent, and that the statement was to the effect that he had been shoved off of the truck on which he was working by a heavy timber, and that at that time he felt something slip or tear in his back and that this statement was made at a time when Robert knew he would not recover.

"6. Mittie Couey testified that she had known Robert Shelton all her life, and that his health had been good prior to the injury; that she saw Robert on the day of his injury. He got out of a car at her home because he was too sick to go on home and Robert told her that he had got hurt at the mill. He went to her toilet and passed blood; she immediately thereafter saw the blood that had passed.

"7. Elgin Harris testified that he, Jewell Parks and Robert Shelton were loading timbers 6" x 6" 10 feet long, and some of them 12 feet long, off of a small truck into a boxcar when the boy (Robert Shelton) got hurt. Decedent picked up one and then fell down and when he looked around decedent was lying on the ground on his knees. Witness asked him what was the matter and he said, 'Just another day.' *He never worked another day.* They finished that car and decedent went home. He never worked any more. 'The boys asked me what I ruptured him for. I said he ruptured himself.' The timber kicked up in front. He fell about six feet. He was about as tall as witness. Decedent was weak after the fall; not able to work much the rest of the day.

"To overcome the foregoing evidence for the claimant, respondent produced the following witnesses:

"1. Jewell Parks virtually corroborated Elgin Harris as to the fall and injury. He was helping load

the timber. The timbers were heavy and it took a big man to push them. Decedent got overbalanced and stepped off the stack and fell off and one foot hit the ground; Elgin asked him if it hurt him and he said, 'Just another lucky day.' He stood there awhile, shook his head and then got back on the timber. He did the best he could after that. They worked on for awhile and did not think Robert was that sick until he was dead. Saw him go behind a boxcar to make water. He did not say anything about passing blood to witness. Witness was in the boxcar at that time. The truck decedent was standing on was three feet, four inches high. After the fall decedent shook his head and mumbled something and then said, 'Just another lucky day.' The timber was heavy, and he was not man enough to shove it and the weight of the timber shoved him off. He stood there with his hands on the stack and his face downwards and shook his head for about two minutes. He appeared to be dazed. He considered himself lucky that he didn't break his leg or the timber didn't fall on his head. Mr. Gordon was not present. He fell off, had a hard fall. The timber coming back pushed him off. He got a jolt while he was in a strained position. Both witness and Harris were much larger than decedent.

''2. There were other witnesses who knew nothing of the actual fall and injury, some of whom testified that Robert Shelton's work had not been as good as theretofore.

## Findings

''Upon the foregoing evidence the court finds that all of the evidence, even that of respondent, establishes that Robert Shelton received an accidental injury on January 28, 1942, that arose out of and in the course of his employment with the respondent, employer.

''It is conceded by Dr. Ward, Dr. White and Dr. Simmons that the decedent was a badly diseased man at the time they treated him and the only other question to be decided by the court is whether or not there is any substantial competent evidence to support the findings

of the commission to the effect that the accidental injury received by decedent on January 28, 1942, did not accelerate, aggravate or lighten up the preexisting or latent infirmity of which decedent was suffering, and this question greatly concerns the court.

"Dr. Ward was evidently a busy man. Although decedent was paying him for his medical treatment, Dr. Ward was unable to go to see him and when decedent was carried to his office he was forced to wait long hours before obtaining a prescription, and he evidently did not make a thorough examination of the man until Dr. Simmons was employed by the respondent to come to Fordyce from Pine Bluff to make an examination at a time when respondent knew the claim was pending and this examination was made on or about March 8, 1942, and decedent died about five days thereafter. Their opinion could constitute nothing more than an answer to a hypothetical question, which is squarely met by the opinion of Dr. White who treated decedent throughout his injury and sickness and who testified that it was his opinion that the injury did accelerate, aggravate and lighten up the preexisting or latent infirmity of the decedent and thereby hasten his death, but the answer to the query is to be found in the physical facts and what actually happened. Robert Shelton had worked regularly for seven years for respondent without having lost any time. Respondent had him physically examined and that record was called for by the claimant and was not produced. Had he been treated by the company doctor for any serious defects prior to the injury, for which treatment decedent had paid out of his monthly wages for seven years, that would most certainly have been shown.

"On January 28, he received an injury while working for respondent and immediately became sick and passed blood from his kidneys and the passage of the blood continued until his death. He never worked another day and immediately went or was carried home where he remained until his death.

"In the recent case of *Oviatt, Administrator, v. Garretson,* 205 Ark. 792, 171 S. W. 2d 287, the Supreme Court of Arkansas made the following statement: 'These and other physical facts appeal to common sense and reason more than do hypothetical questions and answers.' The foregoing statement squarely answers the question here presented.

"It is the judgment of the court that there is not sufficient competent evidence to support the findings of the commission, and the facts found by the commission do not support the award and the same will be reversed, and an award granted to claimant and the dependent child against the respondent, Fordyce Lumber Company, in accordance with the act."

For the reasons stated in the foregoing opinion of the circuit court I respectfully dissent from the holding of the majority herein; and I am authorized to state that Mr. Justice ROBINS and Mr. Justice KNOX join me in this dissent.