STOUT CONSTRUCTION COMPANY v. WELLS.

4-8764                                         217 S. W. 2d 841

Opinion delivered February 28, 1949.

742

*Buzbee, Harrison & Wright,* for appellant.

*Ed E. Ashbaugh* and *Lee Miles,* for appellee.

GRIFFIN SMITH, Chief Justice. Fred Wells, Jr., died September 20, 1946. The question is whether an injury received September 4th was a contributing cause, requiring that Wells' widow and mother be compensated.

The accident occurred when wood thrown from a ripsaw penetrated the operator's left foream. The so-called "splinter" was an eighth of an inch thick, probably an inch wide, and an inch and a half in length. It was part of a larger cut or segment projected with considerable force. It is intimated that another free object was hurled by the saw, and that it struck Wells. A bruised spot was found over the heart and left hip. Another description of the injuries is that they were "brush burns."

Wells was working for Stout Construction Company. The mill superintendent, John L. Ulmer, immediately took the injured man to Dr. Harvey Shipp's office, where the splinter was removed through an operation that necessitated slitting the skin and flesh. A local anesthetic was used. In order to facilitate drainage, the wound was dressed, but not closed. It was the Doctor's opinion that the wound was not incapacitating and that Wells could have returned to work at once. However, it was thought best that he remain home for a few days

to avoid possibility of infection, hence medical discharge did not occur until September 9th.

September 12th Ulmer called Dr. Shipp, saying that Wells was not in a satisfactory condition. An examination showed temperature of 102, with evidence of urinary disorder. Inquiry disclosed a history of kidney trouble and treatment by Dr. Frank Smith. There upon Dr. Shipp suggested that the patient's regular physician be called, and this was done.

Statements made by Wells to Dr. Smith emphasized injuries to the left side over the heart, and in the region of the left groin. Examination indicated pain in these areas. There was some abdominal distension. The urine contained a large amount of blood. The diagnosis was nephritis. Pain occurred over each kidney; both hands and feet were swollen. Dr. Smith first treated Wells in May, 1946. The diagnosis disclosed cystitis. Malaria subsequently developed. As late as August there were no symptoms of nephritis, or Bright's disease.

When Wells called at Dr. Smith's office September 12th X-ray pictures had been taken by Drs. Rhinehart and Rhinehart to determine whether injuries not disclosed by exterior bruises had been sustained. The result was negative. Dr. Smith thought there was little doubt that Wells' kidney disease had existed for a considerable period, but "I simply hadn't located it until after the accident." When asked whether the trauma of September 4th contributed to Wells' death, Dr. Smith (after mentioning that he had treated the patient in August) said:

"Well, in this way: A man whom I had just treated and allowed to go back to work, [and who says, 'I'm feeling all right'] and whose urinary tests are negative, sustains an accident and dies from it—dies from what appeared not to have been a severe accident; [therefore] I presumed that the shock had brought back a recurrence of nephritis: had brought on this acute attack."

When asked whether nephritis could be brought on "as a recurring condition by shock alone," the witness replied:

"Possibly in this manner: Anything that would lower a person's resistance would allow a return of a disease of that kind, possibly in its acute form. In other words, if persons were strong,—if they were [medically] treated and well taken care of, they might live for quite a while, [even with] nephritis; [but] if they were hurt, if they were injured, if they were given a shock, it might reduce their ability to resist the encroachment of a disease such as nephritis."

Dr. Smith then said: "Well, figuring that the accident had hurt him and had brought a shock to his nervous system, [then] it had reduced his resistance to a point where the nephritis had become acute and had destroyed him. . . . It is my opinion that he died of nephritis; [but I also believe] that the accident lowered his resistance and was a contributing factor to his death. . . . .No organ was damaged [in a manner that could have] aggravated the condition. There is no connection there. The blow over the heart, . . . the bruised condition of the tissue over the heart,—these were indications of a traumatic injury, but that wouldn't necessarily affect his kidneys any more than the blow in the groin would affect them; nor do I consider that the kidneys were injured by the blow in the groin."

When Dr. Smith saw Wells in May the patient had high blood pressure. These symptoms were present in August and September. When he examined Wells September 13th the amount of pus in the urine was sufficient to be seen without microscopical aid.

Appellant's Superintendent Ulmer testified that Wells was ill during August, but reported for duty on the 30th. However, he was not well enough to work, and did not until September 3rd.

By consent of interested parties Wells' body was exhumed for examination. The autopsy, performed by Dr. E. Lloyd Wilbur November 26th, was covered by a report made by the pathologist December 19th. Counsel for the claimants objected that the report was in-

complete and inconclusive and protested when it was offered in evidence before the Commission.

The Chairman's ruling was followed by lengthy cross-examination of Dr. Wilbur, who conceded the left forearm was so badly decomposed that a determination of the conditions at the time of death was difficult; still, said the Doctor, a pus pocket "possibly" could have been discovered, although there were no evidences of the injury treated by Dr. Shipp. The left breast did not disclose trauma, "nor any [fractures]," although a healing infection was discovered in the left pleural cavity. Since there were no external signs of injury, then, speculatively, the affecting organism responsible for conditions noted in the pleural cavity could logically have come through the blood stream. The Doctor would not deny or affirm that the cavity infection was due to traumatic cause, but there was a *possibility,* and the result could have carried infection to the kidneys.

Dr. Wilbur was finally asked whether "the infection of the healing infection in the pleural cavity caused this man's death," and he replied that in his opinion it did not.

Dr. M. J. Kilbury, pathologist, testified to a hypothetical question propounded by counsel for claimants, shown in the footnote.[1] Appellants' objections are also shown.

---

[1] The hypothetical question: "A colored man, age 38 years, while working at a sawmill operating a gang saw, received an injury caused by a heavy sliver of wood flying back from the saw and striking him over the left breast, in the left groin, and left hip and left forearm, severely bruising the left breast, left groin and left hip, and severely lacerating the under surface of the left forearm, causing a large open wound. He was given medical attention and put to bed. He later developed high fever, began to pass blood and pus with his urine, complained of his left groin hurting him, there being considerable swelling in his left groin and a large amount of drainage of pus from the wound on the left forearm. This was nine days after the injury. A medical examination brought forth the diagnosis that the man was suffering from chronic nephritis with edema. There was no evidence of the man having nephritis at the time of the injury. The injury occurred on or about September 4, 1946, and the man died on September 20 following the injury. He was never able to return to his work following his injury, and was never able to be out of his bed except to be taken to the doctor's office. Examinations for syphilis and gonorrhea just prior to the injury were negative. The deceased at the time of his injury and for several months prior had been working at this sawmill nine hours a day, operating a gang saw."

Chairman Peel permitted Dr. Kilbury to testify, commenting that answers not within the issues and the expression of opinion based upon erroneous hypotheses would not be considered.

Dr. Kilbury very frankly stated that from a medical standpoint the material and significant consideration was the laceration on Wells' left arm. He "wasn't greatly impressed with anything else." Other expressions were: "I just think this injury might have caused him some trouble, nephritis or no nephritis." It was more apt to produce adverse results in one afflicted with nephritis because if the kidneys are weakened the likelihood of toxemia is increased. "But," said the Doctor, "evidence brought out by the autopsy indicates [badly] impaired kidneys. Whether he would have died right away or not, I don't know. I don't think one could say how long he would have lived. . . . Assuming correctness of Dr. Wilbur's findings, [diseased kidneys were of themselves] sufficient to have caused death, some time or other."

Dr. Wilbur, when recalled for further testimony, stated that when the autopsy was performed Dr. Shipp

The objection was: "The respondents object for the reason that the facts are hypothesized in the question: rather, all the facts [that are] hypothesized in the question are not substantiated . . . by evidence. Specifically, there is no evidence that Wells was struck in the left breast. There is no testimony that there was a severe bruising of the left breast, left groin, and left hip. There is no testimony that the patient was put to bed because of the injury or trauma, testimony being to the contrary. The statement that there was no evidence that Wells had nephritis at the time of injury is not supported by evidence, and the assertion that the deceased, at the time of injury and for several months prior thereto had been working at a sawmill nine hours a day operating a gang saw, is contrary to the evidence—which was that Wells became disabled from working August 20, 1946, and had medical attention and felt badly until September 3; that he felt badly that day and that the injury occurred September 4, or about a day and a half after his return from work, being off work for a considerable time. There is objection for the further reason that the question does not hypothesize all of the pertinent facts—namely, the man had a history of kidney trouble for four or five years; that upon being confined to Baptist Hospital in June 1945 there were found numerous pus cells in the urine, red blood cells '2-plus', bacteria '2-plus', with crystals. Further, that the testimony is that the man had kidney trouble from January 1946, was forced to change occupations because of kidney trouble, and upon advice of the doctor he was off from work from about January to March 1946; that he was treated in the month of May for kidney trouble and for bladder trouble, specifically nephritis and cystitis."

was present part of the time and showed where the sliver entered. Deterioration was not so extensive in respect of muscle and deep tissue as to preclude ''some findings.'' There was no indication of any ''pocket of infection,'' although the outer skin was ''eroded.''

Dr. Shipp, while conceding that a pleural infection of the nature mentioned by Dr. Wilbur could have aggravated preëxisting kidney disorders, expressed the opinion that such an infection, if in fact it existed, was not caused by the experiences to which Wells was subjected when the mishap occurred September 4; nor did he think there was a probability secondary infection from the arm wound contributed to death. The method of treatment left the incision open to permit healing by granulation, and when the Doctor was called September 12th there were no signs of infection. But, definitely, an infection *can* aggravate an illness of the nature suffered by Wells. Dr. Kilbury, in testifying, approved the treatment administered by Dr. Shipp and thought infection was less likely to result from an non-sutured wound than from one that had been closed.

Dr. Wilbur's report to the Commission shows findings made in consequence of the autopsy, with a summation.[2]

---

[2] In his report Dr. Wilbur said: "The principal question involved here is, Did the man's injury cause death or shorten the length of time he lived? A second question involved is, What was the cause of death? The most logical approach to the problem would be to take the second question first. The cause of death was kidney failure. The kidney failure was the result of a long-standing infection of the kidneys and a partial obstruction of the flow of urine from the bladder out through the urethra. None of these factors was in any way dependent on his injury. They all antedated the injury—all except death of the patient.

"We know from his clinical history as obtained at his admission from June 8, 1945, to June 19, 1945, that he had been treated for kidney trouble for four or five years and that two years before that admission (that is, in 1943) he had had some form of operation for kidney trouble—the exact type of surgery we do not know. At the time of his admission in 1945 he had a purulent discharge from his penis, also a burning on urination and frequent urination. This is adequate evidence for a tentative diagnosis of gonorrhea. One of the complications of gonorrhea is a stricture of the urethra, especially if the patient has been infected more than once. This could easily cause the series of clinical events we find in this case. We do not know beyond all question of doubt that this patient had gonorrhea at this time, although such a diagnosis is on the chart. We do not know if this was the first time he was ever infected with gonorrhea. How-

Appellees seemingly concede that but for Dr. Wilburs' testimony there was a conflict in the evidence, to be resolved by the Commission. But, it is insisted, there is contradiction in Dr. Wilbur's testimony in that he first expressed the opinion that the pleural infection "had little if anything" to do with Wells' death, while later the Doctor said that this condition was "very difficult to explain." It is therefore suggested that the physician was either confused, or unworthy of belief.

We are not in accord with this construction of Dr. Wilbur's testimony. On the contrary, he appears to have meticulously considered all of the elements and to have distinguished between *probabilities* and *possibilities*. The pleural infection (if in fact infection existed) created a mere possibility of results adverse to the primary cause of death. Dr. Kilbury, upon whom appellees strongly rely, had not seen Wells as a patient, nor was the Doctor present when the autopsy was performed. But even his testimony, when confined to facts as distinguished from presumptions posed by the hypothetical question, was in no sense conclusive. In effect, he said the kidney ailment could have been aggravated by a secondary in-

---

ever, we do know this: that he had an infectious or inflammatory type of lesion in the urethra which caused the pus, the frequency of burning. . . .

"By our autopsy study we are sure that his kidney damage had been present for months or years. The kidney damage is so great that there was eventually kidney failure. . . .

"Another finding which does add something to the picture is the presence of a healing infection in the pleural cavity. There are no ribs broken and no evidence of external damage to the chest wall, nor is there evidence of preëxisting pneumonia. . . . We are at a loss to find a completely satisfactory explanation for this healing infection. From the general appearance of the tissue I believe that the infection occurred after the injury. . . . The most logical source for this (infection) would be the infected urinary tract—not only as the prime cause of death, but as a possible cause of the infected pleural cavity. To my mind the infected pleural cavity is very difficult to explain. It is possibly due to the trauma. This cannot be denied, nor can it be affirmed. It is a *possibility.*

"To summarize: The cause of this man's death is renal failure due to a long-standing kidney infection and some obstructing lesion in the urethra. This is more than likely due to gonorrhea or other urethral infection. The infection of the pleural cavity may have caused some detrimental effect on the patient, although the actual amount of infection and its very evident healing certainly are not consistent with a lesion than itself would produce death. In the face of the fatal lesion in the kidneys the pleural infection may have had a more profound effect than in a perfectly normal individual is possible. However, it is certainly not the lesion that caused the death."

fection, if there were such. He then pointed to circumstances from which an inference might arise that the unhealed arm contained a pus pocket, and, speculatively, hostile bacteria were present and were possibly picked up by the blood, to burden defective kidneys in a way to produce death quicker than would have been the case had there been no injury.

To reverse the Commission's rejection of compensation, Circuit Court must have found that the refusal to make an award was not supported by substantial evidence. *J. L. Williams & Sons, Inc.,* v. *Smith,* 205 Ark. 604, 170 S. W. 2d 82. In all the cases where sufficiency of the evidence was at issue we have held that the Commission acts as a jury. It must, however, take a liberal view in favor of the Act's purpose to compensate those who come within its terms or who by reasonable construction are within it. Where one of two opposing inferences would support an award and the other would defeat it, the construction favorable to the claimant ought to be adopted if factually sound; and this is true even though an equally substantial inference thereby fails. *Simmons National Bank* v. *Brown,* 210 Ark. 311, 195 S. W. 2d 539. Circumstantial evidence is not to be excluded; neither is it to be weighed in a manner differing from the consideration it would receive at the hands of a jury.

In the case at bar it was the Commission's duty to answer the factual question and to base its decision upon a fair preponderance of the evidence. Having done this, an award or a rejection will not be judicially nullified if on appeal substantial testimony in favor of the determination is found.

There is nothing in Dr. Wilbur's testimony subjecting it to the inferential criticism of partisanship or destructive inconsistency. On the contrary, the Commission could have observed a sincere purpose to measure all of the facts, whether favorable or unfavorable to the claimants, and to frankly admit that in respect of uncertain problems medical knowledge ended and speculation began.

It is true Dr. Smith testified that when Wells called on him September 12th the arm wound contained pus. Opposing this finding was Dr. Shipp's testimony that there was appropriate granulation without infection of any kind. Dr. Shipp was supported by Dr. Wilbur to the extent that condition of the body permitted examination of a more or less unsatisfactory nature. These were matters considered by the Commission in the light of a history of kidney disease and other organic disturbances, some of a serious nature.

It follows that Circuit Court erred in holding that the Commission's rejection of the claim was not supported by substantial evidence. Reversed, with direction to reinstate the Commission's order.

ROBINS and MILLWEE, JJ., dissent.