C. & B. Construction Company *v.* Roach.

4-9721                                                   248 S. W. 2d 368

Opinion delivered April 21, 1952.

*Wright, Harrison, Lindsey & Upton,* for appellant.

*Clayton Farrar* and *Wood & Smith,* for appellee.

Ed. F. McFaddin, Justice. This is a claim by Mrs. Roach for workmen's compensation because of the death of her husband, Will Roach. The Workmen's Compensation Commission denied a recovery; the Circuit Court reversed the Commission's decision; and the case is here on appeal.

The C. & B. Construction Company, (sometimes hereinafter called the ''employer'') was engaged in constructing a steel reinforced concrete stadium at the Greenwood School in Hot Springs; and Will Roach (the deceased) was working as a manual laborer on the project, and had so worked for about three months. Part of the time, he carried reinforcing rods, but for several work days prior to his death (Monday, April 3, 1950), he

had worked as a concrete helper. Roach would get a sack of cement (weighing about 90 pounds), carry it about thirty steps to the mixing box, and mix the cement with an equal quantity of sand. Then he would get water and thoroughly wet the mixture, which the witnesses referred to as "mud." Finally, Roach would carry about 40 pounds of the "mud" in a bucket to the finishers, then working about 70 feet away and up a slight incline. It was estimated that he carried one bucket of "mud" every 15 or 20 minutes.

Will Roach was 53 years of age, and had never been sick. If he had any heart trouble or other ailment, no one knew of it. Several days prior to the day of his death, and while engaged in carrying the steel reinforcing rods, Roach told one of his fellow-workers that he wanted some easier work; but he never made any such request to his foreman. Before Roach left home on Monday morning, April 3rd, he told his wife that the work he was doing was too hard for him. She testified that he had never complained to her of his work being too hard until two or three days before that date. Roach went to work at the usual hour on the Monday mentioned, stopped for lunch at noon, went back to work at one o'clock, and about two o'clock, he became sick. He left the job, drove his car home, and died a few minutes after reaching his home. The death certificate gave the cause of death as "coronary thrombosis, due to coronary sclerosis."

Several witnesses, who worked with Roach, testified as to the working conditions, his statements to them, or the type of work Roach was doing. Dominic Victio testified that he was foreman on the construction job on which Will Roach was employed on the day of his death; that Roach had worked for him approximately three months doing common labor; that common labor consisted of digging ditches, cutting down trees, pouring cement, carrying forms and helping cement finishers; that Roach did all this work at various times; that the job as a helper to a cement finisher was no more strenuous than any other ordinary job; that on the last day Roach worked, about 11:00 A. M., he came to witness and told him that he was sick with stomach ache; that witness told Roach

that if he did not feel good, to go home and not work, but Roach said that he would stay on; that witness watched Roach for a while; that Roach went over to a form, laid down across it and vomited; that approximately 1:30, Roach said he was going over to the drugstore to get something for his stomach; and that witness asked Roach if he was coming back, and Roach said he didn't think he would come back.

Dr. Rowland was called by the claimant as an expert in cardiac conditions. He had never treated or examined Will Roach. In response to the question as to what effect overexertion or undue strain would have on a person suffering from arteriosclerosis, Dr. Rowland stated that the question could not be answered unequivocally, because the complete answer was not known. As to what effect overexertion would have toward causing coronary thrombosis, Dr. Rowland said that the answer was far more difficult: ". . . we don't know medically whether that (overexertion) actually produces a coronary thrombosis or not, but good authorities believe that it may." Whether indigestion, or something else, caused Roach's death, the record fails to show. There was no autopsy.

On the foregoing evidence and other of a similar nature, the Commission refused compensation to Mrs. Roach; and we cannot say that the Commission's decision is without substantial evidence to support it. See *Fordyce Lumber Co.* v. *Shelton,* 206 Ark. 1134, 179 S. W. 2d 464; and *Springdale Monument Co.* v. *Allen,* 216 Ark. 426, 226 S. W. 2d 42. There was no evidence of an increased work load placed on Roach, so as to make applicable here the holding in such cases as *Triebsch* v. *Athletic Mining & Smelting Company,* 218 Ark. 379, 237 S. W. 2d 26; and *Scobey* v. *Southern,* 218 Ark. 671, 238 S. W. 2d 640, 243 S. W. 2d 754.

Therefore, the judgment of the Circuit Court is reversed, and the decision of the Workmen's Compensation Commission is reinstated and affirmed.

Chief Justice not participating.

Justices MILLWEE and WARD dissent.

WARD, J., dissenting. My dissent to the conclusion reached in the majority opinion is based on the following:

First. There is no material conflict regarding the facts and circumstances of deceased's employment and death, so we might say that all the testimony before the Commission and this court is undisputed. Therefore it is not a question of this court giving to the findings of the Commission the same weight we would give to the findings of a jury on a question of fact. In other words no question of fact is involved. The only question involved is: Do the proven facts bring the case within the statute?

Second. In my opinion the testimony is sufficient to show a causal connection between the employment or work being done by the deceased and his death. (a) The death certificate shows that death was caused from coronary thrombosis, due to coronary sclerosis. (b) Death ensued almost immediately after deceased quit work, and he suffered and complained during the last few hours of work. (c) The doctor said he could not say for sure that exertion "actually produces coronary thrombosis or not, but good authorities believe it may" but he did say "that over-exertion would certainly aggravate it, make it more severe." This is the vital part of the doctor's testimony but it does not appear in the majority opinion. We have many times held that exertion need not cause but merely contribute to a heart condition resulting in death.

This is an opportune time to discuss another matter which seems to me important and which must be confusing to litigants and particularly to the Commission. The matter I refer to is this: In instances where a claim is based on death resulting from a heart condition aggravated by over-exertion in the course of employment, is it necessary, before the claim can be allowed under our statute, that there must be some "unusual happening or accident" not ordinarily expected in the usual or normal course of employment? For the sake of clarity and convenience I will refer hereafter to the view that such unusual happening or accident is necessary to recovery as "view A" and the view that there may be recovery

where no such unusual happening or accident is shown by the evidence I will refer to as "view B."

The dissenting opinion of Justice MILLWEE in the recent case of *Farmer* v. *L. H. Knight Co.*, ante, p. 333, 248 S. W. 2d 111, and the concurring opinion of Justice McFADDIN in the recent case of *Baker* v. *Slaughter*, 248 S. W. 2d 106, both decided April 7, 1952, show very forcefully and clearly that these two "views" are discernible in our former opinions, and both constitute strong arguments for "view B." Thus it is obvious that there appears to be a conflict, or certainly some confusion, on this point in our former opinions. However, notwithstanding we have in some cases reached conclusions which apparently approve one view and in other cases reached conclusions which apparently approve the other view, this court has never spelled out plainly which view it is adopting. I think we should do this. Judging from the language used by the Commission in many cases it would seem that it adheres to "view A." This may be because the Commission so interprets the statute, or it may be because it thinks this court so interprets the statute, or it may be because it cannot tell what is our interpretation of the statute and it is merely waiting for us to take a definite stand. Certainly litigants and the general public would be interested in knowing exactly what our interpretation is or will be in the future.

To my mind sound and practical reasoning does not support "view A" and that to attempt to follow it will perpetuate the confusion. I would like to illustrate by the case of *McGregor & Pickett* v. *Arrington*, 206 Ark. 921, 175 S. W. 2d 210, where recovery was approved. Apparently, though not clearly, the court's conclusion was reached under "view A." If this be true it must have been because the court found there was an unusual happening or accident. The so-called "accident" consisted in the laborer trying to slide a board into place. This, to my mind, is making a distinction that does not exist in fact. Can it be reasonably insisted that the laborer's regular course of employment required him only to carry the board up to where it was to be used and that it was

no part of his regular employment to put the board in place? This situation clearly demonstrates that if we adopt "view A" we will continually be faced with the difficulty, in border-line cases, of deciding what acts of the employee are or are not within the usual course of employment.

To some there may be the fear that if we adopt "view B" it will amount to making the employer an insurer. It seems to me that this fear springs from a failure to recognize that there is another barrier which must be surmounted before recovery can be allowed. I refer to the barrier of "causal connection." Regardless of whether we adopt "view A" or "B" there can be no recovery until there is shown a "causal connection" between the strain or labor [whether it occurs in the usual course of employment or by reason of some accident or unusual happening] on the one hand and the death of the employee on the other. Take the case of moving the plank referred to above, even though "view A" was [presumably] applied still this court had to find that a causal connection existed. Had we applied "view B" we would have still had to find that the same "causal connection" existed. So, by adopting "view B" this court and the Commission will at least be relieved of making hair-line distinctions between unusual happening and usual course of employment, but will be left with the problem of deciding when there is a "causal connection." Naturally many cases will arise which will present border-line questions of "causal connection," but these close questions of fact cannot be avoided regardless of which view we follow.

At the risk of appearing laborious and tedious I want to try to make my thoughts on the matter as clearly understood as possible. Frankly I am unable to tell which view this court has adopted if, in fact, it has or has meant to adopt either view. Particularly in the earlier cases, it seems to me that we have adhered to "view A," but in more recent cases it appears that we have chosen "view B." Consider again the *Arrington* case referred to above. There recovery could be approved, logically, only under

"view B," yet language in the opinion indicates a labored effort to bring the case within "view A" though the facts do not justify such a classification. When a case appears before us where the "causal connection" is clear and we feel deeply that recovery should be allowed we should not, in order to reach the desired conclusion, be under the compulsion of creating an "accident or unusual happening" when none in fact exists.

With border-line cases in mind the question may be asked: By what rule shall we measure and determine "causal connection"? There are two answers to this question. First, as indicated above, it is immaterial to this discussion what the answer is because the same question has to be answered regardless of whether we adopt "view A" or "view B." Second, a good rule already announced by this court appears in *Simmons National Bank* v. *Brown,* 210 Ark. 311, 195 S. W. 2d 539, where it was said:

". . . an injury arises out of employment when there is apparent to a rational mind, upon consideration of all the circumstances, a *causal connection* between the conditions under which the work is required to be performed and the resulting injury.

". . . it is enough if there be a *causal connection* between the injury and the business in which he is employed—a connection substantially contributory, though it need not be the sole or proximate cause."
There are many cases and texts dealing with causal connection, consequently this court may be well guided along that line.

The rule described as "view B" is to my mind the better rule. Not only has this court in effect and principle approved this view, as is seen from the dissent of Judge MILLWEE and the concurrence of Judge McFADDIN referred to above, but in my opinion, based on a somewhat careful examination, the weight of authority in other jurisdictions supports this view. See: *Lumbermen's Mutual Casualty Co.* v. *Griggs,* 190 Ga. 277, 9 S. E. 2d 84; *Williams* v. *Cities Service Gas Co.,* 151 Kan. 497, 99 P.

412

2d 822; *Juhl* v. *Hussman-Ligonier Co.*, 146 S. W. 2d 106 (Mo.); *Devlin* v. *Dept. of Labor and Industry*, 194 Wash. 549, 78 P. 2d 952; *Hurd* v. *Republic Underwriters*, 105 S. W. 2d 428 (Texas); *Barker* v. *Narragansett Racing Assn.*, 65 R. I. 489, 17 A. 2d 23; *Black Forest Ranch Co.* v. *Garrett*, 110 Col. 323, 134 P. 2d 332; *Derby* v. *Swift & Co.*, 188 Va. 336, 49 S. E. 2d 417; *Carney* v. *Heller*, 155 Kan. 674, 127 P. 2d 496; *Hemphill* v. *Tremont Lumber Co.*, 24 So. 2d 635 (La.); and *Christensen* v. *Dysart*, 42 N. Mex. 107, 76 P. 2d 1.

Again I want to emphasize, notwithstanding my views and regardless of what view this court may finally adopt, it appears important in the interest of every one concerned, that we make our position clear and definite, and the sooner the better.