CHICAGO MILL & LUMBER COMPANY v. FULCHER.

4-9934                                          256 S. W. 2d 723

Opinion delivered April 6, 1953.

904

*Daggett & Daggett*, for appellant.

*Dinning & Dinning*, for appellee.

JESSE TAYLOR, Special Justice. Wiley Fulcher was in the employ of Chicago Mill & Lumber Company on November 20, 1947, on which date Fulcher sustained an accidental injury arising out of and during the course of his employment. At the time of his injury Fulcher was 58 or 59 years of age. He had worked for the Chicago Mill & Lumber Company for about thirteen years and had lost no time from work because of illness. Fulcher was injured when a load of lumber slipped off the loading jack and hit his right leg causing a large laceration just above the ankle. He was treated by Dr. George R. Storm, of Helena, Arkansas, from the date of the injury until April 18 or 19, 1948, when Dr. Storm released Fulcher as cured and able to return to work. Fulcher returned to work immediately and worked until May 18, 1948. He returned for further treatment of his leg by Dr. Storm on May 15, 1948, at which time there had developed an ulcer (sometimes referred to in the testimony as a running sore) at the point of the original injury and the foot and part of the ankle were swollen. Fulcher was treated by Dr. Storm from May 15, 1948, to May 4, 1949, when Fulcher's right leg was amputated below the knee. The leg refused to heal, then on August 22, 1949, Fulcher's leg was amputated between the knee

and the hip and then on September 14, 1949, he was released from further treatment.

Fulcher was paid compensation through May 6, 1949, and his medical and hospital bills through May 6, 1949, have been paid by Chicago Mill & Lumber Company. The average weekly wage of Fulcher and the rate of compensation payment is not in dispute. On May 6, 1949, Chicago Mill & Lumber Company (hereinafter referred to as appellant) ceased paying compensation. Appellant contended there was no causal connection between the original injury and the amputations.

After the testimony of the injured Fulcher and the testimony of six doctors and having before it the hospital records the Workmen's Compensation Commission found against Fulcher and denied his claim. Upon appeal to the Circuit Court that court reversed the Commission and found for Fulcher. We are asked by the appellant to reverse the Circuit Court and to sustain the finding of the Commission.

Our Court has said that the Compensation Commission's duty on conflicting evidence is to answer factual questions and to base its decision upon a fair preponderance of the evidence and having done this an award or rejection will not be judicially nullified if on appeal substantial testimony in favor of the determination is found. *Stout Lumber Co.* v. *Wells,* 214 Ark. 741, 217 S. W. 2d 841.

Further, upon appeal we must weigh the testimony in its strongest light in favor of the Commission's finding. *Sherwin-Williams Company* v. *Yeager,* 219 Ark. 20, 239 S. W. 2d 1019.

Findings of fact of Workmen's Compensation Commission must be given the same effect as a verdict of a jury, hence Circuit Court and the Supreme Court on appeal will not set aside Commission's finding based upon substantial evidence. *Fordyce Lumber Co.* v. *Shelton,* 206 Ark. 1134, 179 S. W. 2d 464.

The finding of the Commission was that there was no causal connection between the claimant's injury on

November 20, 1947, and the amputations of his right leg in May and in August, 1949. The question before this court is whether or not there was substantial evidence in the record to support the finding of the Commission.

Fulcher testified as to the date, time and nature of his injury, which are not in dispute. He had worked for the Chicago Mill & Lumber Company about thirteen years; had lost no time because of illness prior to the injury; he did not know that he was suffering from high blood pressure or hardening of the arteries; his left leg had never given him any trouble; the injury to his right leg was about two or three inches above his ankle on both the outside and inner-side of his leg.

Dr. George R. Storm testified as follows: He first treated Fulcher for his injury on November 21, 1949, the injury being a laceration five or six inches long on his lower right leg above the ankle; that he treated him twice in November, 1947, twelve times in December, 1947, eight times in January, 1948, eight times in February, seven times in March, five times in April and on or about the 18th of April he released him to return to work when the wound was completely healed; he next saw Fulcher on May 15, 1948, when his right foot and lower leg had an ulcer about an inch long and a quarter of an inch wide. He was then treated with bed rest and hot applications and improvement was shown to a time just prior to the amputation, when it would not respond to treatment; the ulceration came back across the foot, his second and third toes turned black and he developed gangrene; that there was no connection between the original injury and the ulcer; that the claimant's lower right leg had become green and the gangrenous condition resulted from high blood pressure and arteriosclerosis.

He stated that Fulcher had hardening of the arteries (arteriosclerosis) and high blood pressure which resulted in a decrease of blood supply in the extremity of his leg and that, in turn, brought on the gangrenous condition which necessitated amputation; that there was no connection between the ulcer and the original wound; that

the first amputation below the knee was at the request of Fulcher although Dr. Storm wished to amputate *above* the knee, that the first operation did not relieve the gangrenous condition but that the second one did. Dr. Storm further testified there are two sorts of gangrene— wet and dry. Wet gangrene shows trauma within 24 hours to a week; dry gangrene is a slow process—a drying up of the tissues because of decreased blood supply. Gangrene resulting from an old sore would occur at the site of the sore. In this case the gangrene causing the operation was on the foot and extended up the leg; there was no causal connection between the injury of November 20, 1947, and the gangrenous condition of May, 1949; the gangrenous condition which necessitated the amputations resulted solely from a condition of high blood pressure and arteriosclerosis.

Dr. C. P. McCarty testified that he examined Fulcher at the request of Dr. Storm in May, 1949, at which time he found Fulcher had gangrene in the foot and a marked condition of arteriosclerosis and high blood pressure and the patient would have died if it had not been for the amputation. He states that after the first amputation the tissues below the knee did not have a proper blood supply and did not heal, that the second amputation was above the knee where there was a greater supply of blood and after the amputation the leg healed. He stated that the injury was on the outside of the right lower leg and would not have affected the blood supply above the knee nor below the knee and that the gangrene resulted from an occlusion or stoppage of the blood supply. In his opinion the injury of November 20, 1947, was not a causative factor in the amputations caused by gangrene. He says that when he examined Fulcher before the amputation, gangrene was evident in the toes and that the ulcerated condition on the ankle was not gangrenous. He further states if gangrene had resulted from the injury or the ulcer it would have been wet gangrene and would have developed immediately, not fourteen months after the injury.

Dr. Frank M. McAdams also testified in behalf of the appellant and stated that in practice and in experience he had seen cases of gangrene caused by arteriosclerosis in older people where there was no injury at all; he further stated that arteriosclerosis may involve one part of the body only; a person could have one good leg and one bad one, and that blood vessel disease only might result in gangrene at the foot or leg, that ulceration is usually the first sign of gangrene. He stated that traumatic injury was not the cause of gangrene in this case, that an insufficient blood supply to keep tissues below the knee alive explains the gangrene and necessitated the amputation; that an injury to the lower leg would not affect the blood supply above the site of the injury and that for gangrene to occur secondary to an injury it would be necessary for the large blood vessel to be completely severed or occluded from such an injury; in his experience in Wade's Clinic at Hot Springs he knows of at least a dozen patients who have had amputations of the leg due to arteriosclerosis without history of any previous injury to the leg. He stated that no living person can look at a man whose leg has been amputated and tell why it had to be cut off.

It will be noted that Dr. Storm, Dr. McCarty and Dr. McAdams all testified before the Workmen's Compensation Commission and were cross-examined by members of the Commission.

On behalf of the claimant Dr. William A. Ellis first testified that he had never known gangrene to develop from arteriosclerosis; that gangrene developed because of loss of circulation to tissues; that the condition of arteries had nothing to do with it, and gangrene would not have developed but for the original wound. In his opinion there was a festering sore, together with the impairment of the circulatory system, that caused the gangrene and he was more inclined to think the injury interrupted the blood supply and that arteriosclerosis had not progressed to last stages when he examined the claimant.

Dr. Allen E. Cox testified that he has spent 56 years in the practice of medicine, is surgeon for the Illinois Central Railroad and Missouri-Pacific Railroad and has been a member of the medical association for 50 years and has treated arteriosclerosis for which there is no known cure, its natural course being to grow progressively worse from year to year. He stated extreme cases of arteriosclerosis develop into gangrene from stoppage of blood in the arteries; stated if flesh becomes infected or an ulcer forms that would interfere with the flow of blood to that part, and that a wound in that part of the body (lower leg) would be more difficult to heal. Stated that gangrene developed when blood supply was shut off and if it had not been for the original wound the gangrene would not have developed. He also stated that trauma is the most frequent cause of gangrene and that in his opinion both arteriosclerosis and the wound were factors in the gangrene and he further stated that unless both factors were present it is to be doubted that gangrene would have developed; he said Fulcher could have had gangrene irrespective of the wound. Asked if as a result of the 42 treatments Dr. Storm discharged the patient on April 17, 1948, pronouncing the trauma of November, 1947, as completely healed, he would be inclined to agree with Dr. Storm's diagnosis he stated he would. Asked, "If in June, 1949, Drs. Storm and McCarty performed an amputation on the patient's leg at a point four or five inches below the knee and thereafter found it necessary to perform a second operation, amputating at a point above the knee, based upon their findings and their treatment of the claimant subsequent to the first amputation for the reason that the blood supply down to the point of the original amputation was failing to allow the stump to heal, and that a gangrenous condition was beginning to appear in the leg down to the point of the original amputation, you would be inclined to agree with Drs. Storm and McCarty that those operations were not due to the original trauma, wouldn't you?", he answered that he would be inclined to agree with them and he further stated that the injury at a point

two inches above the ankle could not have affected the blood supply in the upper portion of the leg.

Dr. J. W. Nicholls testifying in behalf of the complainant stated he had not seen the claimant prior to the amputation. He stated that he had never heard of arteriosclerosis causing gangrene and that improper circulation caused the muscles to dry for lack of blood to feed the muscles and that it could be caused by traumatism, but further stated that one don't have insufficient blood to a part from arteriosclerosis. He also stated that a chronic ulcer can heal without much circulation, and get gangrenous and that arteriosclerosis will not cause the swelling of a leg. He further stated that with high blood pressure and arteriosclerosis no one portion of the body is more adversely affected than the other and that the disease of arteriosclerosis progresses sometimes rapidly and sometimes slowly. He said hypertension and high blood pressure are synonymous and arteriosclerosis and hypertension are also synonymous. He further stated that the cause of the first amputation in healing was lack of a supply of blood in the capillaries at the site of the amputation and that deficiency was caused by gangrene.

Of the six doctors who testified only Dr. Storm was acquainted with the injury from its inception. Dr. C. P. McCarty was called in by Dr. Storm before the amputation and made an examination of the claimant before the amputation. Dr. McAdams, Dr. Ellis, Dr. Cox and Dr. Nicholls had not examined or observed the claimant prior to the amputation.

In *J. L. Williams & Sons, Inc.* v. *Smith,* 205 Ark. 604, 170 S. W. 2d 82, this court held that the Circuit Court did not have the legal right, upon an appeal from a finding of fact made by the Workmen's Compensation Commission, to set aside such finding of fact merely because in the opinion of the court that finding was contrary to the weight of the testimony.

To reverse the Commission's rejection of compensation the Circuit Court must have found that refusal

to make an award was not supported by substantial evidence.

We said in *Fordyce Lumber Co.* v. *Shelton,* 206 Ark. 1134, 179 S. W. 2d 464, ''The effect of our decision is that the Commission's finding of fact must be given the same force and effect as the verdict of a jury, or of the Circuit Court setting as a jury, and consequently the Circuit Court and this court on appeal will not set aside the Commission's finding when based upon substantial testimony.'' If the findings of fact made by the Commission are supported by any substantial evidence such findings will not be disturbed by either the Circuit Court or this Court on appeal. *Simmons National Bank* v. *Brown,* 210 Ark. 311, 195 S. W. 2d 539.

We have gone to considerable lengths to set out the evidence produced by both claimant and respondent. There was substantial evidence to support the finding of the Commission against the claimant.

In *Starrett* v. *Namour,* 219 Ark. 463, 242 S. W. 2d 963, we said: ''It is not a question of what we would hold if we were the *de novo* triers of fact. The question before us is whether the Commission had substantial evidence to support its finding, and a careful study of the record discloses there was such evidence.''

The judgment of the Circuit Court is herewith reversed with direction to that court to revise its judgment to show affirmance of the factual finding of the Commission.

Justices MILLWEE and ROBINSON dissent; the Chief Justice not participating.